# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TEAMSTERS WESTERN REGION & LOCAL 177 HEALTH CARE PLAN, on behalf of itself and all others similarly situated, <br><br> Plaintiff. <br><br> v. <br><br> ABBVIE, INC., ALLERGAN, INC., ALLERGAN SALES, LLC, ALLERGAN USA, INC., FOREST LABORATORIES, INC., FOREST LABORATORIES, LLC, FOREST LABORATORIES HOLDINGS, LTD., and FOREST LABORATORIES IRELAND LTD., <br><br> Defendants. | CASE NO. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

# CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................... 1

II.    JURISDICTION AND VENUE ............................................................................... 11

III.   THE PARTIES ......................................................................................................... 12

IV.    UNNAMED (AS DEFENDANTS) CO-CONSPIRATORS .................................... 15

V.     PHARMACEUTICAL MARKET BACKGROUND .............................................. 16

VI.    PHARMACEUTICAL REGULATORY BACKGROUND .................................... 18

       A.    The Hatch-Waxman Amendments ................................................................ 18

       B.    Regulator Exclusivities for New Drugs ....................................................... 20

       C.    ANDA Paragraph IV Certifications ............................................................. 21

       D.    The First Filer's 180-day Exclusivity Period ............................................... 22

       E.    Patents Are Routinely Invalidated or Held Unenforceable .......................... 23

       F.    The Competitive Effects of AB-Rated Generic Competition ...................... 24

             1.    The first AB-rated generic is priced below the brand. ...................... 25

             2.    Later generics drive prices down further. ......................................... 26

             3.    Pharmaceutical manufacturers can game the regulatory structure in
                   order to impair competition. ............................................................. 26

             4.    Side deals provide a means for manufacturers to share the gains
                   from conspiring. ................................................................................ 30

VII.   FACTUAL ALLEGATIONS ................................................................................... 31

       A.    Basic Chemistry Relating to the Active Pharmaceutical Ingredient in
             Bystolic ........................................................................................................ 31

       B.    Forest's Bystolic Patents .............................................................................. 34

       C.    The Generic Competitors File ANDAs for Generic Versions of Bystolic ... 39

       D.    The Bystolic Patent Litigation ..................................................................... 40

       E.    Forest Enters into Unlawful Reverse-Payment Agreements with the Generic
             Competitors .................................................................................................. 42

VIII.    MARKET POWER AND DEFINITION ............................................................ 48

IX.    MARKET EFFECTS ........................................................................................ 51

X.    ANTITRUST IMPACT AND IMPACT ON INTERSTATE COMMERCE ................... 52

XI.    EFFECT ON INTRASTATE COMMERCE ....................................................... 54

XII.    CLASS ACTION ALLEGATIONS ................................................................. 55

XIII.    FRAUDULENT CONCEALMENT AND CONTINUING VIOLATIONS .................... 58

    A.    Defendants Fraudulently Concealed Their Anticompetitive Scheme .................. 58

    B.    Defendants' Continuing Violations of the Antitrust Laws .................................. 60

XIV.    COMPLIANCE WITH NOTICE AND DEMAND REQUIREMENTS .......................... 60

XV.    CLAIMS FOR RELIEF .................................................................................. 63

XVI.    DEMAND FOR JUDGMENT ....................................................................... 110

XVII.    JURY DEMAND ....................................................................................... 111

Plaintiff Teamsters Western Region & Local 177 Health Care Plan ("Plaintiff"), on behalf of itself and all others similarly situated, brings this Class Action Complaint against AbbVie, Inc. ("AbbVie"); Allergan, Inc., Allergan Sales, LLC, and Allergan USA, Inc. (collectively, "Allergan"); and Forest Laboratories, Inc., Forest Laboratories Holdings, Ltd., Forest Laboratories, LLC, and Forest Laboratories Ireland Ltd. (collectively, "Forest") (together, AbbVie, Allergan, and Forest are "Defendants") for Defendants' violations of the antitrust laws concerning the pharmaceutical drug Bystolic® (nebivolol hydrochloride) ("Bystolic"). Based on (a) personal knowledge, (b) the investigations of counsel, and/or (c) information and belief, Plaintiff alleges:

## I.     INTRODUCTION

1.      This case arises from Defendants' unlawful exclusion of generic substitutes for the branded drug Bystolic, causing members of the proposed Class (defined below) to pay too much for this crucial drug.

2.      Bystolic, the brand name for nebivolol hydrochloride or nebivolol HCl, is a "beta blocker" used to treat high blood pressure. Defendants manufacture the brand version of Bystolic. Bystolic is a blockbuster drug for Defendants, delivering nearly $1 billion in United States annual sales.

3.      No doubt aware of the huge market opportunity, in December 2011 generic manufacturers began seeking approval with the U.S. Food and Drug Administration ("FDA") to market generic nebivolol hydrochloride. Yet, due to Defendant's unlawful anticompetitive conduct, no generic competitor has entered or will enter the market until September 17, 2021.

4.      Generic drugs, also called "generics," contain the same active ingredient as their branded counterpart drugs and are therapeutically equivalent. Generics, however, are typically at

least 50-80% less expensive than their brand-name counterparts when there are multiple generic competitors on the market. When a generic enters the market, sales of the brand-name drug drop rapidly. AB-rated generics typically take 80% or more of the sales of a drug molecule from the brand name product within six months of generic entry. This rapid shift from the brand-name drug to the generic is largely the result of drug substitution laws, which permit (and in many states require) dispensing pharmacies to substitute available AB-rated generic drugs for a branded drug unless the prescribing physician specifically orders otherwise. Entry of generics thus means both cost savings to drug purchasers, such as Class members, and a serious threat to the monopoly power and profits of the brand-name manufacturer.

5.     To protect its monopoly profits, Forest entered into multiple unlawful pay-for-delay deals (also known as "reverse-payment" agreements) with each of its potential generic competitors for Bystolic: Alkem Laboratories Ltd. ("Alkem"); Amerigen Pharmaceuticals, Inc. and Amerigen Pharmaceuticals, Ltd. (collectively, "Amerigen"); Generics Inc., USA, Glenmark Generics Ltd., and Glenmark Pharmaceuticals S.A. (collectively, "Glenmark"); Hetero USA, Inc. and Hetero Labs Ltd. (collectively, "Hetero"); Indchemie Health Specialties Private Ltd. ("Indchemie"); Torrent Pharmaceuticals Ltd. and Torrent Pharma, Inc. (collectively, "Torrent"); and Watson Pharma, Inc. and Watson Pharmaceuticals, Inc. (collectively, "Watson") (collectively, Alkem, Amerigen, Glenmark, Hetero, Indchemie, Torrent, and Watson are referred to as the "Generic Competitors").

6.     Each of these serial deals, which Forest entered into from October 2012 through November 2013, had two components. First, each of the Generic Competitors agreed not to compete with Forest or enter the Bystolic market prior to September 17, 2021, unless another generic competitor entered the market earlier. Second, in exchange, each of the Generic

Competitors received "side-deals," and cash payments, the precise amounts of which have not been publicly disclosed except that, on information and belief, they each exceed $15,000,000 in value. As corporate successors to one or more of the Defendants, Allergan and then AbbVie have continued this illegal collusion and unreasonable restraint of trade in the market for nebivolol HCl, all at the expense of Plaintiff and the proposed Class.

7.     These pay-for-delay deals arose from patent litigation filed by Forest against each of the Generic Competitors. Beginning on December 17, 2011, after the Generic Competitors became the first generic manufacturers to seek approval from the FDA to market generic Bystolic, Forest sued each of them. Forest accused them of allegedly infringing U.S. Patent No. 6,545,040 (the "'040 Patent"), which Forest successfully submitted for listing in the FDA Orange Book by certifying that the patent covered Bystolic. These suits, filed in mid-March 2012, automatically triggered stays of FDA approval of the generic products. This meant that regardless of the merits of the patent infringement actions, the FDA could not grant final approval to any of the Generic Competitors to launch a generic product before June 18, 2015 absent an earlier favorable decision for the Generic Competitors or a dismissal of the actions. Foreclosing the Generic Competitors from launching generic Bystolic also foreclosed all other generic manufacturers because, as the first manufacturers to file for approval for generic Bystolic, the Generic Competitors were eligible to share 180 days of market exclusivity, free from competition from other generic manufacturers (other than a generic marketed or authorized to be marketed by Forest, also known as an "authorized generic"), once they actually launched their generic versions of Bystolic.

8.     Between March 2012 through November 2013, while the stays were in effect, the Generic Competitors litigated the patent infringement suits and prepared to bring their generic

Bystolic to market to compete with Forest's branded Bystolic. At least six of the seven Generic Competitors would have been ready to launch well before September 17, 2021, as each had final FDA approval to do so as shown in the table below:

| Generic Manufacturer | ANDA No. | Final Approval Date |
|---|---|---|
| Amerigen | 203659 | Apr. 16, 2015 |
| Watson | 203683 | Nov. 27, 2015 |
| Alkem | 203741 | June 24, 2015 |
| Glenmark | 203821 | May 25, 2017 |
| Indchemie | 203828 | July 29, 2015 |
| Torrent | 203966 | Mar. 2, 2018 |

9.      The Generic Competitors would have succeeded in the patent litigation because the '040 Patent was weak. The '040 Patent litigation likely would have concluded by mid-2015, including all appeals. The Generic Competitors would have won and launched their generic Bystolic product by the later of: (a) June 2015, which was the expiry of the only other patent that Forest contended covered Bystolic, U.S. Patent No. 5,759,580 (the "'580 Patent"), or (b) the date their Abbreviated New Drug Applications ("ANDAs") were finally approved. But rather than risk facing competition from the Generic Competitors as early as June 2015 and the subsequent reduction in Bystolic brand sales and revenues such competition would cause, Forest paid the Generic Competitors to stay off of the market until September 17, 2021.

10.      The side-deals that Forest provided to each Generic Competitor were intended to shield Forest from the risk of competition, and the Generic Competitors readily accepted these exclusionary side-deals to quit the patent fight.

11.      On February 18, 2014, Actavis PLC and Forest announced an equity and cash merger. On March 1, 2014, Forest's outside lawyers at Weil, Gotshal & Manges LLP were reviewing Forest's documents as part of their "work on the Actavis merger agreement." On

March 4, 2014, Forest's outside lawyers informed Forest in-house counsel Eric Agovino via email (the "Agovino email") that "[b]efore we engage in any discussions with the FTC . . . we think it would be prudent for us to review all of the Bystolic settlement and licensing *agreements as well as the side agreements with those generic companies*." (Emphasis added.) Agovino replied:

> We entered into settlement agreements with the following defendants:
>
> 1)    Hetero
>
> 2)    Torrent
>
> 3)    Alkem
>
> 4)    Indchemie
>
> 5)    Glenmark
>
> 6)    Amerigen
>
> 7)    Actavis [Watson's successor]
>
> *All had side-deals* (one was struck with Alkem, which is a related company with Indchemie). [Emphasis added.]

12.    Forest's Agreement and Plan of Merger with Actavis PLC (the "Merger Agreement"), dated February 17, 2014, provides additional details. Specifically, in the Merger Agreement Forest disclosed its "material contracts," which are defined to include "any Contract involving the settlement of any action or threatened action (or series of related actions) (A) which will (x) involve payments after the date hereof of consideration in excess of $15,000,000 or (y) impose monitoring or reporting obligations to any other Person outside the ordinary course of business or (B) with respect to which material conditions precedent to the settlement have not been satisfied."

13.     Forest listed each of the side-deals as a "material contract" "in connection with the settlement of BYSTOLIC patent dispute."

14.     Thus Forest has described each of the side deals set forth below as a "material contract," *i.e.*, it was a "Contract involving the settlement of any action or threatened action (or series of related actions) (A) which will (x) involve payments after the date hereof of consideration in excess of $15,000,000 or (y) impose monitoring or reporting obligations to any other Person outside the ordinary course of business or (B) with respect to which material conditions precedent to the settlement have not been satisfied." The respective contracts are set forth below.

    a.     **Hetero:** "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd, and Hetero USA Inc. and Hetero Labs Ltd. dated October 24, 2012 . . . together with the FINAL TERM SHEET between Hetero Drugs Ltd. and Forest Laboratories Ireland Ltd. dated October 5, 2012, in connection with the settlement of BYSTOLIC patent dispute."

    b.     **Torrent:** "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Torrent Pharmaceuticals Ltd. and Torrent Pharma Inc. dated November 21, 2012 . . . together with the PATENT ASSIGNMENT AGREEMENT between Torrent Pharmaceuticals Ltd and Forest Laboratories Holdings Ltd. dated November 21, 2012, in connection with the settlement of BYSTOLIC patent dispute."

c.    **Alkem/Indchemie:** "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Alkem Laboratories Ltd. dated November 27, 2012 .. . together with the TERM SHEET between Alkem Laboratories Ltd., Indchemie Health Specialties Private Ltd., and Forest Laboratories Ireland Ltd. dated November 28, 2012, in connection with the settlement of BYSTOLIC patent dispute. AMENDMENT NO. 1 TO SETTLEMENT AGREEMENT was executed on January 9, 2013" and "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd, and Indchemie Health Specialties Private Ltd. dated November 27, 2012 . . . together with the TERM SHEET between Alkem Laboratories Ltd, Indchemie Health Specialties Private Ltd, and Forest Laboratories Ireland Ltd. dated November 28, 2012, in connection with the settlement of BYSTOLIC patent dispute."

d.    **Glenmark:** "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd, and Glenmark Generics Inc., USA and Glenmark Generics Ltd. dated December 21, 2012 . . . together with the COLLABORATION AND OPTION AGREEMENT between Glenmark Pharmaceuticals S.A. and Forest Laboratories Holdings Ltd. dated December 21, 2012, in connection with the settlement of BYSTOLIC patent dispute."

e.    **Amerigen:** "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Amerigen

Pharmaceuticals, Inc. and Amerigen Pharmaceuticals, Ltd. dated July 18, 2013 . . . together with the BINDING TERM SHEET COLLABORATION AGREEMENT between Forest Laboratories, Inc. and Amerigen Pharmaceuticals, Ltd. dated July 18, 2013, in connection with the settlement of BYSTOLIC patent dispute."

f.    **Watson:** "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Watson Laboratories, Inc. (NV), Watson Laboratories, Inc. (DE), Watson Laboratories, Inc. (NY), Watson Laboratories, Inc. (CT), Watson Pharma, Inc., and Actavis, Inc. dated November 6, 2013 . . . together with (a) the LETTER from Forest Laboratories, Inc. to Moksha8, Inc. dated November 1, 2013 and (b) TERMINATION AND RELEASE AGREEMENT between Actavis, Inc. and Moksha8, Inc. dated November 4, 2013, in connection with the settlement of BYSTOLIC patent dispute."

15.    Forest listed the side deals in the Merger Agreement because, on information and belief, they "involve payments after the date [t]hereof of consideration in excess of $15,000,000."

16.    As Forest publicly acknowledged in the Agovino email, and in the Merger Agreement, the side deals were entered into as part and parcel of Forest's patent settlement agreements with the Generic Competitors in the Bystolic patent litigation.

17.    In addition to the consideration Forest provided each Generic Competitor in the form of a side deal, Forest "agreed to reimburse certain of the Settling Defendants' legal costs in connection with the patent litigation."

18.    Forest also disclosed that its settlement agreements with the Generic Competitors "provide[d] a license to each of the Settling Defendants that will permit them to launch their respective generic versions of Bystolic as of the date that is the later of (a) three calendar months prior to the expiration of the '040 patent, including any extensions and/or pediatric exclusivities or (b) the date that each Settling Defendant receives final FDA approval of its ANDA, or earlier in ***certain circumstances***." (Emphasis added.) The bolded language typically refers to what is known as a "contingent launch provision" ("CLP"), or an "acceleration clause." CLPs ensure a settling generic that it will not be competitively disadvantaged should a later settling generic negotiate an earlier licensed entry date or otherwise come to market earlier. Under the CLPs the entry date may be "accelerated," permitting the settling generic to enter the market at the same time as any of its competitors. CLPs ensure settling generic ANDA filers that, if any other ANDA filer somehow makes it to market before the agreed-upon licensed entry date, that ANDA filer's licensed entry date would be accelerated so that it could launch at the same time.

19.    When CLPs are used, they generally operate the same way in each ANDA filer's settlement agreement. Under a CLP, the first-filing ANDA filer (or, as here, filers) obtains protection from other first filers by agreeing to delay the launch of their generic products from the date of settlement until a date certain (here, exactly three months before the expiration of the '040 Patent), but if and only if all other first-filer generic companies follow suit. By engineering the agreements, Forest ensured that, without regard to the strength of the Generic Competitors' challenges to the '040 Patent, Bystolic would have no generic competitors and Forest would maintain patent-generated monopoly profits until at least September 17, 2021, and none of its generic competitors would come to market earlier.

20.     Reverse-payment agreements like the side deals in this case delay the entry date for generic drug products beyond the date when competition would ensue in the absence of a reverse payment. Without the ability to offer or accept an unlawful reverse payment, Forest and the Generic Competitors would have instead agreed upon an earlier licensed entry date for generic versions of Bystolic. And, because of the CLPs, if just one of the Generic Competitors did not take an unlawful payment, and instead insisted on an earlier entry date untainted by a side deal, every other Generic Competitor would enter on the same earlier date.

21.     But for the anticompetitive reverse payments, the Generic Competitors would have launched their generic products earlier either: (a) at risk; or (b) upon prevailing against Forest in the underlying patent litigation; or (c) via lawful settlement agreements providing for earlier negotiated entry dates untainted by the delay caused by the unlawful reverse payments.

22.     Had any of the above scenarios played out—as would have occurred absent the unlawful reverse payments—Plaintiff and the proposed Class (defined below) would have paid substantially less for nebivolol HCl.

23.     Defendants' conduct was designed to, did, and continues to: (a) delay the entry of less expensive, AB-rated generic versions of Bystolic; (b) fix, raise, maintain, or stabilize the price of nebivolol HCl; and (c) allocate 100% of the United States market for nebivolol HCl to themselves until three months before expiration of the '040 Patent.

24.     Defendants' monopoly power in the nebivolol HCl market was maintained through willful exclusionary conduct, as distinguished from growth or development as a consequence of a legally-obtained valid patent, other legally-obtained market exclusivity, a superior product, business acumen, or historical accident.

25.    Plaintiff brings this action as an end-payor purchaser of Bystolic, on its own behalf and on behalf of all similarly situated end-payor purchasers. As alleged below, Defendants' unlawful conduct injured Plaintiff and the proposed Class by preventing generic nebivolol HCl manufacturers from entering the market with competing generic products and has cost Plaintiff and the proposed Class hundreds of millions of dollars in overcharge damages.

26.    Plaintiff and the proposed Class seek to recover damages, including treble damages, under the state antitrust, unjust enrichment, and consumer protection laws enumerated below as well as injunctive relief.

## II.    JURISDICTION AND VENUE

27.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this Complaint asserts a claim (*see* Sixth Claim for Relief, below) for violations of federal law, namely sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

28.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members of the class; and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.

29.    This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a).

30.    Venue is appropriate within this District under 28 U.S.C. § 1391. Defendants transact business within this District and/or have agents in and/or that can be found in this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

31.     Defendants' conduct, as described in this Complaint, was within the flow of, and was intended to and did have a substantial effect on, the interstate commerce of the United States, including in this District.

32.     During the Class Period (defined below), Defendants manufactured, sold, and shipped Bystolic in a continuous and uninterrupted flow of interstate commerce. Defendants' anticompetitive conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

33.     During the class period, each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate the scheme.

34.     The Court has personal jurisdiction over each of Defendants. Defendants have transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme throughout the United States, including in this District. The scheme has been directed at and has had the intended effect of causing injury to individuals and companies residing in or doing business throughout the United States, including in this District.

35.     Personal jurisdiction also lies under Fed. R. Civ. P. 4(k)(2) over the foreign domiciliary defendant.

## III.    THE PARTIES

36.     Plaintiff Teamsters Western Region & Local 177 Health Care Plan is a multiemployer health and welfare plan headquartered in Arizona that provides self-funded healthcare coverage to over 40,000 employees and their family members. During the Class Period, as defined below, Plaintiff purchased, paid, and/or provided reimbursement for some or all of the purchase price of Bystolic for the personal and/or household use of its members, and not for resale, from pharmacies located in and/or on behalf of members located in Alaska, Arizona,

California, Colorado, Florida, Hawaii, Idaho, Illinois, Indiana, Louisiana, Massachusetts, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Texas, Utah, Virginia, Washington, and Wisconsin. Plaintiff paid more than it would have absent Defendants' unlawful anticompetitive scheme to prevent generic entry and was injured as a result of the illegal and wrongful conduct alleged herein. Plaintiff intends to continue purchasing Bystolic and has been, is, and will continue to be injured as a result of Defendants ongoing unlawful conduct.

37.    Defendant Forest Laboratories, Inc. is a Delaware corporation having its principal place of business at 909 Third Avenue, New York, New York 10022.

38.    Defendant Forest Laboratories Ireland, Ltd. is an Irish Corporation with a place of business at Clonshaugh Industrial Estate, Dublin 17, Ireland.

39.    Defendant Forest Laboratories Holdings, Ltd. is a Bermudian corporation having a principal place of business at 18 Parliament Street, Hamilton HM 11, Bermuda. In or around February 2006, Defendant Forest Laboratories Ireland, Ltd. changed its name to Forest Laboratories Holdings, Ltd. and changed its residence from Ireland to Bermuda.

40.    Defendant Forest Laboratories, LLC is a company organized and existing under the laws of Delaware, with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054. On July 1, 2014, in a series of transactions, Forest Laboratories, Inc. became a limited liability company named Forest Laboratories, LLC. On July 1, 2014, Actavis PLC ("Actavis") acquired Defendant Forest. On May 17, 2015 Actavis acquired Defendant Allergan, Inc. but maintained the name Allergan for its ongoing operations. Subsequently, on January 1, 2018, Forest Laboratories, LLC was merged with and into Defendant Allergan Sales,

LLC, a Delaware limited liability company. As a result of these corporate consolidations, the Forest Defendants are predecessors in interest to Allergan Sales, LLC.

41.    Defendant Allergan Sales, LLC is a company organized and existing under the laws of Delaware, with its principal place of business at 5 Giralda Farms, Madison, New Jersey 07940.

42.    Defendant Allergan, Inc. is a Delaware corporation with its principal place of business located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054.

43.    Defendant Allergan USA, Inc. is a Delaware corporation with its principal place of business at 5 Giralda Farms, Madison, New Jersey 07940.

44.    Allergan, through its merger with Forest, assumed responsibility for performance of the challenged provisions in the agreements, continued to perform those provisions, and benefited from making sales of Bystolic to Plaintiff and members of the proposed Class at the supracompetitive prices made possible by the delay those challenged provisions produced.

45.    On information and belief, Forest assigned the reverse-payment agreements to Allergan, and Allergan never withdrew from them.

46.    On information and belief, Allergan joined the ongoing unlawful course of conduct and joined the unlawful reverse-payment agreements, with respect to the suppression of generic competition for Bystolic. Allergan did not withdraw from those conspiracies and instead continued to participate in them.

47.    Defendant AbbVie, Inc. is a corporation organized and existing under the laws of Delaware with its corporate headquarters at 1 North Waukegan Road, North Chicago, Illinois 60064.

48.    AbbVie is the corporate successor to Allergan and Forest, having completed its purchase of Allergan on May 8, 2020.

49.    Defendant AbbVie, through its merger with Allergan, assumed responsibility for performance of the challenged provisions in the agreements, continued to perform those provisions, and benefited from manufacturing and selling Bystolic at the supra-competitive prices made possible by the delay those challenged provisions produced.

50.    On information and belief, Allergan assigned the reverse-payment agreements to AbbVie, and AbbVie never withdrew from them.

51.    On information and belief, AbbVie joined the ongoing unlawful course of conduct and joined the unlawful reverse-payment agreements, with respect to the suppression of generic competition for Bystolic. AbbVie did not withdraw from those conspiracies and instead continued to participate in them.

52.    Defendants' wrongful actions described in this complaint are part of, and were taken in furtherance of, the illegal restraint of trade alleged herein. These actions were authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment and with their actual, apparent, or ostensible authority.

## IV.    UNNAMED (AS DEFENDANTS) CO-CONSPIRATORS

53.    The Generic Competitors (Alkem, Amerigen, Glenmark, Hetero, Indchemie, Torrent, and Watson) are generic drug manufacturers and entered into the illegal agreements with Defendants from October 2012 through November 2013, which agreements are the subject of this

Complaint. The Generic Competitors each initiated and participated in the unlawful conspiracy described in this Complaint, although each is not named as a defendant in this Complaint.

54.     All of the unnamed (as defendants) co-conspirators' actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or undertaken by the unnamed co-conspirators' various officers, agents, employees, or other representatives while actively engaged in the management of the unnamed co-conspirators' affairs within the course and scope of their duties and employment and with their actual, apparent, or ostensible authority.

## V.    PHARMACEUTICAL MARKET BACKGROUND

55.     The marketplace for the sale of prescription pharmaceutical products in the United States is unusual. In most industries, the person who pays for a product is also the person who chooses the product. When the same person has both the payment obligation and the choice of products, the price of the product plays a predominant role in the person's choice of products. Consequently, manufacturers have a strong incentive to lower the price of their products to maintain profitability.

56.     The pharmaceutical marketplace, in contrast, is characterized by a "disconnect" between the payment obligation and the product selection. State laws prohibit pharmacists from dispensing certain drugs to patients unless they can present a prescription written by their physician. This prohibition introduces an anomaly into the pharmaceutical marketplace between the payment obligation and the product selection. The patient (or his or her insurer) has the obligation to pay for the pharmaceutical product, but his or her doctor chooses which product the patient will buy.

57.     In 1984, Congress sought to ameliorate the "disconnect" by authorizing the manufacture and sale of generic pharmaceuticals under the Hatch-Waxman Act, discussed further below. Now, when a pharmacist receives a prescription for a branded drug and an AB-rated generic version of that drug is available, state laws require the pharmacist to dispense the generic instead of the brand. In this way, price is reintroduced to the product selection decision at the pharmacy counter, and the pharmaceutical marketplace "disconnect" is lessened. When an AB-rated generic equivalent is introduced and not prevented from competing, brand manufacturers can no longer exploit the "disconnect," their monopoly power dissipates, and some of the normal competitive pressures are restored.

58.     Because AB-rated generic versions of brand-name drugs contain the same active ingredients and are determined by the FDA to be just as safe and effective as their branded counterparts, the only material differences between generic drugs and their branded counterparts are their prices and manufacturers. Because AB-rated generic versions of branded products are commodities that cannot otherwise be differentiated, the primary basis for generic competition is price.

59.     Typically, generics are 50% to 80% (or more) less expensive than their branded counterparts when there are multiple generic competitors on the market for a given brand. Consequently, the launch of a bioequivalent generic drug usually results in significant cost savings to all drug purchasers.

60.     The combination of these factors—the regulatory interchangeability of bioequivalent generics for the brand, state substitution laws, margin incentives of pharmacies, and the like—results in the typical phenomenon that once a brand drug "goes generic," the product swiftly moves from a monopoly priced to a commodity priced item.

61.    Generic competition enables all members of the proposed Class to purchase generic versions of the drug at substantially lower prices and to purchase the brand drug at a reduced price.

62.    The Hatch-Waxman Act has significantly advanced the rate of generic drug launches while also ushering in an era of historically high profits for brand drug manufacturers. In 1983, before the Hatch-Waxman Act, only 35% of the top-selling branded drugs with expired patents had generic alternatives; by 1998, nearly all did.  In 1984, annual prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009, total annual prescription drug revenue had soared to $300 billion.

63.    The Federal Trade Commission ("FTC") estimates that about one year after market entry, a generic drug takes over 90% of the branded drug's unit sales at 15% of the price of the branded drug. As a result, brand drug manufacturers view competition from generics as a grave threat to their bottom lines.

64.    When a branded drug faces generic drug competition, purchasers are able to (a) purchase generic versions of the drug at much lower prices; and/or (b) purchase the branded drug at a reduced price. Until the generic version of a branded drug enters the market, however, there is no bioequivalent generic to substitute for, and compete with, the branded drug, so the brand manufacturer can continue to profitably charge supra-competitive prices. As a result, brand drug manufacturers, well aware of the rapid erosion of branded drug sales by generics, have a strong incentive to delay the start of generic drug competition. Brand manufacturers often seek to extend their monopolies by any means possible, sometimes even resorting to illegal conduct.

## VI.    PHARMACEUTICAL REGULATORY BACKGROUND

### A.    The Hatch-Waxman Amendments

65.    The Hatch-Waxman amendments, enacted in 1984, simplified regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly

New Drug Applications ("NDA(s)"). A manufacturer seeking approval to sell a generic version of a branded drug may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA and must further show that the generic contains the same active ingredient(s), dosage form, route of administration, and strength as the branded drug, and that it is bioequivalent, *i.e.*, absorbed at the same rate and to the same extent as the branded drug.  The FDA assigns generics that meet these criteria relative to their branded counterparts an "AB" rating.

66.     The Federal Food, Drug, and Cosmetics Act ("FDCA") and Hatch-Waxman amendments operate on the principle that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart.

67.     Through the Hatch-Waxman amendments, Congress sought to expedite the entry of less expensive generic competitors to branded drugs, thereby reducing healthcare expenses nationwide. Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

68.     The Hatch-Waxman amendments achieved both goals, advancing substantially the rate of generic product launches and ushering in an era of historically high profit margins for brand manufacturers. In 1983, before the Hatch-Waxman amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenues for branded drugs and generics totaled $21.6 billion; by 2013, total prescription

drug revenues had climbed to more than $329.2 billion, with generics accounting for 86% of prescriptions. Generics are dispensed about 95% of the time when a generic form is available.

### B.    Regulator Exclusivities for New Drugs

69.    In order to promote a balance between new drug innovation and generic drug competition, the Hatch-Waxman amendments also provided for exclusivities (or exclusive marketing rights) for new drugs. These exclusivities are granted by the FDA upon approval of a drug if statutory requirements are met. These exclusivities are listed in the Orange Book, along with any applicable patents, and can run concurrently with the listed patents.

70.    One such exclusivity, New Chemical Entity ("NCE") exclusivity, applies to products containing chemical entities never previously approved by the FDA either alone or in combination. If a product receives NCE exclusivity, the FDA may not accept for review any ANDA for a drug containing the same active moiety for five years from the date of the NDA's approval, unless the ANDA contains a certification of patent invalidity or non-infringement, in which case an application may be submitted after four years.

71.    A drug product may also receive a three-year period of exclusivity if its sponsor submits a supplemental application that contains reports of new clinical investigations (other than bioavailability studies) conducted or sponsored by the sponsor that were essential to approval of the supplemental application. If this exclusivity is granted, the FDA may not approve an ANDA for that drug for three years from the date on which the supplemental application is approved.

72.    Regulatory exclusivities are not always absolute bars to generic entry. For example, some can be overcome by carving out information in the label or for other reasons.

### C.    ANDA Paragraph IV Certifications

73.    To obtain FDA approval of an ANDA, a manufacturer must certify that the generic will not infringe any patents listed in the Orange Book. Under the Hatch-Waxman amendments, a generic manufacturer's ANDA must contain one of four certifications:

    a)    That no patent for the brand has been filed with the FDA (a "paragraph I certification");

    b)    That the patent for the brand has expired (a "paragraph II certification");

    c)    That the patent for the brand will expire on a particular date and the manufacturer does not seek to market its generic before that date (a "paragraph III certification"); or

    d)    That the patent for the brand is invalid or will not be infringed by the generic manufacturer's proposed product (a "paragraph IV certification").

74.    If a generic manufacturer files a paragraph IV certification, a brand manufacturer has the ability to delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement. If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the paragraph IV certification, the FDA will not grant final approval to the ANDA until the earlier of (i) the passage of two-and-a-half years, or (ii) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to market its product (*i.e.*, grant final approval). The FDA may grant an ANDA tentative approval when it determines that the ANDA is ready for final approval but for the 30-month stay.

### D.    The First Filer's 180-day Exclusivity Period

75.    Generics may be classified as (i) first-filer generics, (ii) later generic filers, or (iii) authorized generics.

76.    To encourage manufacturers to seek approval of generic versions of brand drugs, the Hatch-Waxman amendments grant the first paragraph IV ANDA filer ("first filer") a 180-day exclusivity period to market the generic version of the drug, during which the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand drug. That is, when a first filer files a substantially complete ANDA with the FDA and certifies that the unexpired patents listed in the Orange Book as covering the brand are either invalid or not infringed by the generic, the FDA cannot approve a later generic manufacturer's ANDA until the first generic has been on the market for 180 days.

77.    The 180-day window is often referred to as the first filer's six-month or 180-day "exclusivity;" this is a bit of a misnomer, because a brand manufacturer (such as Defendants) can launch an authorized generic at any time, manufacturing its authorized generic in accordance with its approved NDA for the branded product but selling at a lower price point. Brand manufacturers frequently launch AGs in response to generic entry in order to recoup some of the sales they would otherwise lose.

78.    The Supreme Court has recognized that "this 180-day period of exclusivity can prove valuable, possibly 'worth several hundred million dollars'" to the first filer.

79.    A first filer that informs the FDA it intends to wait until all Orange Book-listed patents expire before marketing its generic does not get a 180-day exclusivity period. Congress created this 180-day period to incentivize generic manufacturers to challenge weak or invalid patents or to invent around such patents by creating non-infringing generics.

### E.    Patents Are Routinely Invalidated or Held Unenforceable

80.    Patents are not bulletproof.  Patents are routinely invalidated or held unenforceable, either upon reexamination or *inter partes* proceedings by the United States Patent and Trademark Office ("PTO"), by court decision, or by jury verdict.  A patent holder at all times bears the burden of proving infringement.

81.    One way that a generic can prevail in patent infringement litigation is to show that its product does not infringe the patent (and/or that the patent holder cannot meet its burden to prove infringement). Another is to show that the patent is invalid or unenforceable.

82.    A patent is unenforceable when it claims a product that is patentably distinct from the allegedly infringing product.

83.    In these circumstances, the PTO's decision to issue a patent does not substitute for a fact-specific assessment of (i) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent, and (ii) whether a reasonable manufacturer in the patent holder's position would have a realistic likelihood of succeeding on the merits of a patent infringement suit.

84.    As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely that a challenged patent will be found invalid or not infringed than upheld. The FTC reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002. An empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 similarly reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.

23

### F.        The Competitive Effects of AB-Rated Generic Competition

85.        Generics contain the same active ingredient(s) and are determined by the FDA to be just as safe and effective as their brand counterparts. The only material difference between generics and their corresponding brand versions is their price. Because generics are essentially commodities that cannot be therapeutically differentiated, the primary basis for competition between a branded product and its generic version, or between generic versions, is price. Consequently, the launch of a generic usually results in significant cost savings for all drug purchasers, especially end-payor purchasers.

86.        Thus, conduct that delays generic entry harms end-payor purchasers (like Plaintiff and the proposed Class members here) in several ways. One way that end-payor purchasers are harmed (suffer overcharges) is that they are forced to continue purchasing the more expensive brand drug instead of the lower-priced generic equivalent they would have purchased had the generics entered earlier. In addition, conduct that delays generic entry causes end-payor purchasers to pay inflated generic prices because (a) generic prices fall over time, and so generic prices would have been lower if generic competition had started earlier; and (b) brand prices typically increase over time and the generic price is discounted off of the brand price, and so the generic prices would have been lower if the generics had launched earlier, when the brand price was lower (since the generic price would have been discounted off of the lower brand price).

87.        Since the passage of the Hatch-Waxman amendments, every state has adopted drug product selection laws that require pharmacies to substitute AB-rated generic equivalents for brand prescriptions (unless the prescribing physician specifically directs that substitutions are not permitted). Substitution laws and other institutional features of pharmaceutical distribution and use create the economic dynamic that the launch of AB-rated generics results both in rapid price decline and rapid sales shift from brand to generic purchasing. Once a generic enters the market,

it quickly captures sales of the corresponding brand drug, often 80% or more of the market within the first six months after entry. In a recent study, the FTC found that on average, within a year of generic entry, generics had captured 90% of corresponding brand sales and (with multiple generics on the market) prices had dropped 85%. As a result, competition from generics is viewed by brand manufacturers, such as Defendants, as a grave threat to their bottom lines.

88.     Generic competition enables all purchasers of a drug to (i) purchase generic versions of the drug at substantially lower prices, and/or (ii) purchase the brand at a reduced price.

89.     Until a generic version of the brand enters the market, however, there is no bioequivalent drug to substitute for and compete with the brand-named drug, and the brand manufacturer can therefore continue to profitably charge supra-competitive prices. Brand manufacturers, such as Defendants, are well aware of generics' rapid erosion of their brand sales. Brand manufacturers thus seek to extend their monopoly for as long as possible, sometimes resorting to any means possible—including illegal means—to delay or prevent generic competition.

### 1.     The first AB-rated generic is priced below the brand.

90.     Experience and economic research show that the first generic manufacturer to market its product prices it below the prices of its branded counterpart. Every state requires or permits that a prescription written for the brand be filled with an AB-rated generic. Thus, the first generic manufacturer almost always captures a large share of sales from the brand. At the same time, there is a reduction in the average price paid for the drug at issue (brand and AB-rated generic combined).

91.     During the 180-day exclusivity period, the first filer is the only ANDA-approved generic manufacturer on the market (though the brand's authorized generic can be, and often is,

25

on the market during the 180-day exclusivity period), and a first-filer generic manufacturer generally makes about 80% of all of the profits that it will ever make on the product.

**2.      Later generics drive prices down further.**

92.      Once generic competitors enter the market, the competitive process accelerates, and multiple generic manufacturers typically compete vigorously with each other on price, driving prices down toward marginal manufacturing costs.

93.      According to the FDA and the FTC, the greatest price reductions are experienced when the number of generic competitors goes from one to two. In that situation, there are two commodities that compete on price.

94.      In a report by the FTC issued at the request of Congress in 2011, the FTC found that generics captured 80% or more of sales in the first six months. In the end, the brand manufacturer's sales decline to a small fraction of their level before generic entry. This is so because, "[a]lthough generic drugs are chemically identical to their branded counterparts, they are typically sold at substantial discounts from the branded price. According to the Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies. Even more billions are saved when hospitals use generics."

**3.      Pharmaceutical manufacturers can game the regulatory structure in order to impair competition.**

95.      When they do not face generic competition, brand manufacturers can usually sell the branded drug far above the marginal cost of production, generating profit margins in excess of 70% while making hundreds of millions of dollars in sales. The ability to make those kinds of profit margins is what economists call market power. When generics enter the market, however, they quickly take 80% or more of the unit sales. And when multiple generics are in the market, the competition between the generics drives their prices to near the marginal cost of production.

This competition puts an end to the brand manufacturer's market power and delivers enormous savings to drug purchasers.

96.    Brand and first-filer generic manufacturers have a collective interest in preventing this competition from breaking out. If they work together to prevent or delay competition, they can keep the profit margins on all of the unit sales at 70% and split the resulting excess profits among themselves. They can keep for themselves the enormous savings that competition would have delivered to drug purchasers.

97.    A brand manufacturer in the marketplace without competition from generics gets all of the profits on all of the unit sales.

98.    When generic entry occurs, the brand manufacturer loses most of the unit sales; generic manufacturers sell most of the units, but at drastically reduced prices; and competition delivers enormous savings to drug purchasers. Competition converts what formerly were excess profits into purchaser savings.

99.    To prevent this from happening, brand and generic manufacturers sometimes (unlawfully) agree to not compete and instead split the purchaser savings between themselves.

100.    Figure 1 compares the impact on a brand manufacturer's profits between (i) a situation where it settles a patent lawsuit on the merits (*i.e.*, with only an agreed entry date and without a pay-off to the generic company); and (ii) a situation where it settles the lawsuit with a large, unjustified payment to the generic manufacturer. In the former situation, the agreed generic entry date for the generic is earlier and the brand manufacturer's profits are thus greatly reduced. In the latter situation, the agreed entry date is later and the brand manufacturer's profits increase significantly. Earlier entry may also occur if the generic manufacturer launches its product at risk

27

(*i.e.*, while the litigation is still pending) or prevails in the patent litigation and then launches its product.



Figure 1: Impact of Delay on Brand Profits

101.    In order for such an anticompetitive pact to work, brand and generic manufacturers need a means by which to divide the purchaser savings between themselves. The generic manufacturer will not refrain from competing if it does not share in the ill-gotten gains through some means. Pay-offs from the brand manufacturer are the means by which brand and generic manufacturers divide between themselves the ill-gotten gains that delayed competition makes possible. These unlawful pay-off deals are often referred to as "pay-for-delay," "exclusion payment," or "reverse-payment" agreements.

102.    The brand manufacturer may choose to (unlawfully) pay off only the first filer, even if other generic manufacturers are also lined up to challenge the patents. The first filer's agreement to delay marketing its drug also prevents other generic manufacturers from marketing their products.

103.    Later ANDA filers have more modest financial expectations because they may have little or no expectation of any form of market exclusivity. By the time they enter the market, there

is at least the brand and one other generic on the market (and often a second generic in the form of an authorized generic) and, thus, the drug has already been, or is on its way to being, commoditized.

104.    In the absence of an anticompetitive agreement between the brand company and the first filer, later ANDA filers have procompetitive incentives. They are motivated to expend resources to challenge the brand manufacturer's patent(s) (knowing that the first-filer generic is also fighting a patent infringement suit) and to enter the market as early as possible.

105.    When an anticompetitive agreement with the first filer is already in place, however, pursuing the litigation to conclusion becomes less attractive to later filers. The later generic manufacturers know that the first filer is not leading the charge against the brand manufacturer's patent(s) (and has sometimes stipulated to the validity or enforceability of the patents as part of an anticompetitive reverse-payment agreement). The later generics have to bear the brunt of the litigation costs themselves and, upon prevailing in the patent litigation, expect to face competition from at least the first-filer generic, and typically an authorized generic as well, despite having expended time and resources litigating the infringement case. The first settlement between a brand drugmaker and first-filer generic (such as the first to file Generic Competitors' and Defendants' agreements at issue here) will often provide that, if a later generic filer launches its generic before the delayed date agreed to by the brand and the first filer, the first filer is permitted to launch then as well. This greatly reduces the incentive the later filer would otherwise have to continue fighting to enter as soon as possible.

106.    Thus, some later generics decide to simply give in to or join the conspiracy between the brand manufacturer and the first-filer generic and agree to drop their challenges to the brand manufacturer's patent(s) and stay off the market until after entry by the first filer.

107.    Pay-for-delay agreements are fundamentally anticompetitive and contrary to the goals of the Hatch-Waxman statutory scheme. In particular, they extend the brand manufacturer's monopoly by blocking access to more affordable generic drugs, forcing purchasers to buy expensive brand-name drugs instead.

### 4.    Side deals provide a means for manufacturers to share the gains from conspiring.

108.    In the past, reverse-payment agreements often took the form of a straight cash payment from the brand name manufacturer to the generic competitor. As these payments attracted regulatory scrutiny, congressional investigations, and class action lawsuits, brand-name manufacturers and generic competitors have entered into increasingly elaborate agreements in an attempt to mask the fundamentally anticompetitive character of their agreements.

For example, the reverse-payment deals that were the subject of *Actavis* involved payments allegedly hidden in co-promotion and manufacturing side deals entered into in connection with settlement of patent litigation over the brand drug AndroGel. Because the profits to be gained by delaying generic competition are so great, however, drug manufacturers retain the incentive to enter into such agreements.

109.    Thus side deals are a form of payment actionable under *Actavis* and are anticompetitive.

110.    The Federal Trade Commission also agrees that side deals may be suspect and evidence of an antitrust violation. An FTC official has taken the position that contemporaneous side deals prompt "the question of whether the deal is designed to persuade the generic to give up an earlier entry date."

## VII.    FACTUAL ALLEGATIONS

### A.    Basic Chemistry Relating to the Active Pharmaceutical Ingredient in Bystolic

111.    Molecules are composed of atoms (*e.g.*, carbon, nitrogen or hydrogen) that are bonded to each other through the sharing of electrons. The atom carbon forms four bonds and tends to adopt a tetrahedral structure. That three-dimensional arrangement can be envisioned as a tetrahedron with the carbon atom at the center and the four substituents at the four vertices of the tetrahedron.

112.    The chemical symbol for a carbon atom is "C." The figure below depicts a carbon atom (labeled as "C") bonded to four different chemical substituents (labeled as "$X_1$," "$X_2$," "$X_3$," and "$X_4$"). The straight lines from the carbon atom (at the center) to "$X_1$" and "$X_4$" are intended to convey that they are in the plane of the page. The solid wedge from the carbon atom to "X3" is intended to convey that it is coming out of the page towards the reader. The hashed wedge from the carbon atom to "$X_2$" is intended to convey that it is coming out of the page but away from the reader. Thus, the below figure reflects a three-dimensional tetrahedral structure with a carbon atom at its center.



113.    When a carbon atom is attached to four different substituents in a tetrahedral arrangement such as that shown above, the substituents can be arranged in either of two

conformations, as depicted below, with a mirror line between them. Note that, much like one's

left and right hands, these two arrangements (see below) are mirror images of one another. And

much like one's left and right hands, they cannot be superimposed on one another by rotation. A

carbon atom bonded to four different substituents can thus exist as either of two "stereoisomers"

and such a carbon atom is referred to as a "chiral center." Naming conventions exist to

distinguish these two stereoisomers from one another, and a commonly used terminology refers

to one configuration as the "R" configuration and the other as the "S" configuration.



114.    Distinguishing between stereoisomers can be particularly important in biological

systems because many active pharmaceutical ingredients ("APIs") in drugs interact with naturally

occurring receptors in the human body by fitting into a three-dimensional site on the receptor,

much like a left hand fits into a left-handed glove. Just as a left hand would not fit properly into a

right-handed glove, the wrong stereoisomer often will not fit into the intended receptor site.  Thus,

it is not uncommon for one stereoisomer to exhibit a desired pharmacological effect in biological

systems while the other does not.

115.    Carbon is so ubiquitous in organic chemicals that a carbon atom in chemical

structures is often abbreviated as a vertex, rather than as a "C," with the understanding that such

vertices are carbon. The chemical symbol for hydrogen is "H," and hydrogen only forms one

bond. Because hydrogen is also ubiquitous and the number of chemical bonds that carbon and hydrogen make (*i.e.*, 4 and 1, respectively) is so well known, hydrogen is often omitted from chemical structures and its presence is assumed when a carbon has less than four bonded substituents.

116.    On March 31, 1987, the United States Patent and Trademark Office ("PTO") issued United States Patent No. 4,654,362 ("the '362 Patent"). The '362 Patent disclosed a number of different chemical compounds, including the following chemical compound:



117.    The unlabeled vertices above correspond to a carbon atom and each of those carbon atoms (vertices) is connected to other atoms. To the extent a particular carbon atom has less than four bonds depicted, the remainder are hydrogen atoms. With this understanding in mind, each asterisk in the above chemical structure corresponds to a chiral center—*i.e.*, a carbon atom bonded to four different substituents—that can adopt either of two configurations that can be labeled as either an "R" or "S" configuration.  As a result, the above chemical structure discloses ten different possible stereoisomers with the following configurations:

|  |  |
|---|---|
| 1. SRRR | 6. SRSS |
| 2. RSSS | 7. RSRR |
| 3. SRRS | 8. RRSS |
| 4. RSSR | 9. SSSS |
| 5. SRSR | 10. RRRR |

118.    Forest was, and its successor in interest Allergan is, the holder of NDA No. 21-742 for Bystolic. The active ingredient in Bystolic is a mixture of two of the above ten stereoisomers:

the SRRR and RSSS stereoisomers (*i.e.*, nos. 1 and 2, above). The mixture of these two

stereoisomers is referred to as nebivolol, and both are present in Bystolic as a hydrochloride salt.

### B.    Forest's Bystolic Patents

119.    Forest certified to the FDA that the '040 and '580 Patents covered Bystolic, and

the FDA listed those patents in the Orange Book. The '580 Patent issued on June 2, 1998 and

expired seventeen years later, on June 2, 2015.  Accordingly, the '580 Patent afforded Forest no

protection from generic competition for Bystolic beyond June 2, 2015.

120.    The '040 Patent issued from United States Application Serial No. 07/825,488 ("the

'488 Application") filed on January 24, 1992.  To understand the impact of prosecution of the '488

Application at the PTO on the scope of the issued claims in the '040 Patent, it is important to

understand the effect of the choice of transition in a patent claim. A patent claim typically has

three parts: the preamble, the transition, and the body.  The preamble is an introductory phrase that

may summarize the invention, its relation to the prior art, or its intended use or properties. The

transition is a phrase connecting the preamble to the body of the claim. The content of the phrase

may indicate whether the elements stated in the body are "open" or "closed." The body of the

claim is the recitation or listing of the elements and limitations which define the product or

process to be encompassed within the patent monopoly.

121.    There are three commonly used transitional phrases: "comprising," "consisting of,"

and "consisting essentially of." These are terms of art in patent law that define the scope of the

claim with respect to what unrecited additional components or steps, if any, are excluded from the

scope of the claim. At one end of the spectrum, the phrase "comprising" signifies that the claim

is "open" to the addition of unrecited components or steps. For example, a claim reciting a

product "comprising" three ingredients A, B, and C encompasses a product composed of A, B, C,

and D (*i.e.*, the addition of D to the A-B-C combination does not avoid infringement).

34

122.    The originally-filed claims in the application that issued as the '040 Patent employed the open transition "comprising." For example, originally-filed claim 19 covered pharmaceutical compositions "comprising" a "pharmaceutically acceptable carrier" and the SRRR and RSSS stereoisomers of nebivolol. The use of the open transition "comprising" meant that original claim 19 covered formulations having the SRRR and RSSS stereoisomers of nebivolol, even if the formulations also included some or all of the other eight unclaimed stereoisomers of nebivolol. The PTO examiner therefore rejected those claims based upon the prior art '362 Patent described above. The examiner reasoned that the '362 Patent taught mixtures of various of the stereoisomers described above, and thus were covered by pending claim 19.

123.    In response, the applicants admitted that the '362 Patent taught "undefined mixtures that may include the presently claimed compounds in admixture with other stereoisomers of the Base Compound. . . ." More specifically, the applicants admitted that "Compound 84 . . . is an undefined mixture of the RSRS, RSSR, and SRRS isomers." In an attempt to overcome the rejection, the applicants narrowed the claims by substituting new claims utilizing the transition "consisting essentially of" rather than "comprising." In doing so, the applicants emphasized that the purpose of the amendment was to distinguish their claims from the undefined mixtures of other nebivolol isomers disclosed in the Prior Art '362 Patent:

124.    Claims 18 and 19 have been rewritten as new Claims 25 and 26. Claim 25 recites "A composition consisting essentially of the compound . . .", and Claim 26 recites "A pharmaceutical composition consisting essentially of . . . [the two compounds (a) and (b)]". This amendment is being made to more clearly distinguish the claimed invention over the prior art ['362 Patent] which, as is explained in detail below, discloses undefined mixtures that may

include the presently claimed compounds in admixture with other stereoisomers of [nebivolol]. Favorable consideration of the amended claims is respectfully requested.

125.    The transition "consisting essentially of" in a patent claim narrows the claim relative to "comprising." With respect to a "consisting essentially of" claim, there is no infringement where the accused product contains additional, unclaimed ingredients that materially affect the basic and novel properties of the invention. Thus, for a claim reciting a product "consisting essentially of" ingredients A, B, and C, the addition of unrecited ingredient D will avoid infringement if D has a material effect on the basic and novel properties of the claimed invention.

126.    The PTO examiner, however, was not persuaded that the use of the "consisting essentially of" transition distinguished the then-pending claims from the '362 Patent. He therefore maintained his rejection of the claims. The applicants for the '040 Patent again argued that it was impossible to tell from the '362 Patent which stereoisomers, and in what amounts, were definitely present in the disclosed mixtures:

> There is no way that one can determine from the teachings of the patent the specific stereoisomeric configuration of [the prior art '362 Patent's] compound Nos. 84 and 87.

The Examiner continued to maintain his rejections and ultimately issued a final rejection of the "consisting essentially of" Claims 25 and 26, as anticipated by the '362 Patent. He also rejected the claims as obvious.

127.    The applicants for the '040 Patent appealed the examiner's final anticipation and obviousness rejections to the Board of Patent Appeals and Interferences ("the Board"). In their brief, the applicants continued to argue that it was impossible to say exactly which stereoisomers (and how much of them) were present in Compound 84 of the prior art '362 Patent, but that the "possible" stereoisomers present in unknown amounts were RSRR, RSSS, SRRR and SRSS.

During the course of briefing the appeal to the Board, the Examiner dropped the anticipation rejection.

128.    The Board nevertheless addressed the anticipation issue and made certain findings and conclusions regarding the relationship between then-pending Claim 26 and Compound 84 of the '362 Patent. Specifically, the Board concluded: [The '362 Patent's] disclosure of compound 84, together with its designation "AB," appears to describe the individual RSSS, SRRR, RSRR and SRSS stereoisomers "just as surely as if they were identified in the reference by name."

129.    The Board then determined that the "consisting essentially of" transition in then-pending Claim 26 caused the claim to cover the undefined mixture of isomers in the Prior Art '362 Patent:

> It is well settled that "the phrase 'consisting essentially of' limits the scope of a claim to the specified ingredients and those that do not materially affect the basic and novel characteristic(s) of a composition." Here, a basic and novel characteristic of the pharmaceutical composition of claim 26 is its blood pressure reducing or antihypertensive effect. Thus, claim 26 is open to ingredients that do not materially affect its antihypertensive activity. [The prior art '362 Patent's] antihypertensive compound 84 is a mixture of four stereoisomers: RSSS, SRRR, RSRR and SRSS. Because the RSSR and SRSS stereoisomers do not materially affect blood pressure reducing or antihypertensive activity, it appears that they are not excluded from the ***composition of claim 26***. (Internal citation omitted and emphasis added).

Accordingly, the Board ordered the Examiner to reconsider his withdrawal of the anticipation rejection based on the Prior Art '362 Patent:

> Specifically, the examiner should consider whether claim 26 'reads on' [the '362 Patent's] compound 84 taking into account the appropriate principles of claim interpretation and the foregoing remarks.

The very clear upshot of the Board's decision was that the claims of the '488 Application were not patentable unless the claims excluded the unclaimed stereoisomers, particularly the RSSR and SRSS stereoisomers.

130.    On remand from the Board, the applicants for the '040 Patent did not even attempt to argue against anticipation in view of the Board's opinion. Instead, they further narrowed their claims by replacing "consisting essentially of" with "consisting of," in new Claims 27 and 28. And based on that change, applicants argued that the new "consisting of" limitation excluded the undefined mixture of possible stereoisomers in the '362 Patent:

> Applicants respectfully submit that the claims, as amended, are patentable over [the prior art '362 Patent]. Applicants submit that neither a composition consisting of the RSSS enantiomer, nor a composition consisting of the RSSS enantiomer and its enantiomer the SRRR enantiomer, are disclosed in [the '362 Patent]. [The '362 Patent] discloses the base compound, as an undefined mixture of stereoisomers, as compound 84 (designated as "AB") and 87 (designated as "AA"), shown in the table in Col. 21 of the patent.

131.    Once again, the applicants expressly noted that "Compound 84 [of the prior art '362 Patent] is an undefined mixture of the RSRR, RSSS, SRSS and SRRR isomers, and Compound 87 [] is an undefined mixture of the RSRS, RSSR, and SRRS isomers." They argued that the new "consisting of" language excluded compounds containing such additional isomers:

> [I]t is clear that the cited [the '362 Patent] discloses neither a composition consisting of the RSSS enantiomer of the base compound, nor a composition consisting of the RSSS and SRRR enantiomers.

132.    And again, applicants did not distinguish their claims based on any particular amount or source of possible unrecited stereoisomers in the "undefined mixture" of the '362 Patent.

133.    The phrase "consisting of" is the narrowest of the transitions and it signifies restriction and exclusion of unrecited steps or components. In light of the Board's reasoning and the applicants' comments and amendments, it is clear that the narrowing amendment was intended to and did exclude the presence of the unclaimed stereoisomers, particularly the RSSR and SRSS stereoisomers (*i.e.*, the claims do not cover formulations containing the unclaimed stereoisomers, especially the RSSR and SRSS stereoisomers).

134.    The Examiner then allowed the "consisting of" Claims 27 and 28, which ultimately issued as Claims 2 and 3 of the '040 Patent in 2003. Subsequently, the '040 Patent was subjected to reexamination proceedings and a reexamination certificate issued in 2009.

### C.    The Generic Competitors File ANDAs for Generic Versions of Bystolic

135.    Alkem, Amerigen, Glenmark Indchemie, Hetero, Torrent, and Watson were the first generic manufacturers to file ANDAs with the FDA containing paragraph IV certifications regarding Bystolic patents. In letters granting final approval to their ANDAs, the FDA noted that each was "one of the first ANDA applicants to submit a substantially complete ANDA with a paragraph IV certification for Nebivolol Tablets."

136.    Because the Generic Competitors were the first companies to file substantially complete ANDAs with paragraph IV certifications, they each stood to receive 180 days of marketing exclusivity during which the FDA would not give final approval to any later ANDA filer's generic equivalent of Bystolic.

137.    Forest received the Generic Competitors' paragraph IV notice letters on the following dates:

| Manufacturer | Paragraph IV Notice Date |
|---|---|
| Torrent | February 2, 2012 |
| Indchemie | February 3, 2012 |
| Alkem | February 3, 2012 |
| Watson | February 13, 2012 |
| Amerigen | February 16, 2012 |
| Hetero | February 17, 2012 |
| Glenmark | February 20, 2012 |

138.    Because they contained paragraph IV certifications, these notice letters were required to include a detailed statement of the factual and legal bases as to why the '040 Patent was invalid, unenforceable, and/or not infringed by their ANDA products. The paragraph IV

notice letters were required to include an offer of confidential access to each Generic Competitor's ANDA under the Hatch-Waxman Act. The notice letters gave rise to a potential cause of action for patent infringement, thereby allowing Forest to file suit against the Generic Competitors under the Hatch-Waxman Act (if Forest otherwise had a basis to sue under Rule 11).

### D.    The Bystolic Patent Litigation

139.    On March 13, 2012, in response to their paragraph IV certification letters, Forest filed a patent infringement lawsuit in the United States District Court for the District of Delaware against Torrent, Watson, Amerigen, Glenmark, and Hetero.

140.    On March 14, 2012, in response to their paragraph IV certification letters, Forest filed a patent infringement lawsuit in the United States District Court for the Northern District of Illinois against Indchemie and Alkem.

141.    By order of the Judicial Panel for Multidistrict Litigation, these cases were consolidated into *In re Nebivolol Patent ('040) Litigation*, 12-cv-5026 (N.D. Ill. June 12, 2012) (ECF No. 1) (hereafter referred to as the "Nebivolol Patent Litigation").

142.    Forest could not prevail in the Nebivolol Patent Litigation. The sole independent claim asserted by Forest in the Bystolic Patent Litigation was claim 2, as shown below:

2.    A pharmaceutical composition consisting of a pharmaceutically acceptable carrier and, as active ingredients:

(a)    the blood pressure reducing compound [2S,αR, 2′R,α′R]- α,α′-[iminobismethylene]bis[6-fluoro-3,4-dihydro-2H-1- benzopyran-2-methanol] having the formula:

or a pharmaceutically acceptable acid addition salt thereof; and

(b)    the compound [2R,αS,2′S,α′S]-α,α′-[iminobismethylene]bis[6-fluoro-3,4-

dihydro-2H-1-benzopyran-2-methanol] having the formula:



or a pharmaceutically acceptable acid addition salt thereof.

'040 Patent at 11:33-12:22. Thus, claim 2 is limited to a pharmaceutical composition consisting

of a pharmaceutically acceptable carrier and, as active ingredients, SRRR-nebivolol and RSSS-

nebivolol (or pharmaceutically acceptable acid addition salts).

143.    The Generic Competitors were well aware of the prosecution history of the '040

Patent and the narrowing amendments the applicants had made. During claim construction

proceedings in the Nebivolol Patent Litigation, they correctly argued that the term "consisting of"

in claim 2 of the '040 Patent "excludes any unrecited stereoisomers of nebivolol." The Generic

Competitors' products did not infringe because they included at least small amounts of the

unrecited stereoisomers of nebivolol, including the RSSR and SRSS stereoisomers.

144.    Early on in the Bystolic Patent Litigation, the Generic Competitors pressed the

argument that the "consisting of" transition precluded the use of a plurality of inactive ingredients.

Their position was premised on the argument that (1) a "pharmaceutically acceptable carrier"

referred to an individual inactive ingredient in a pharmaceutical formulation; (2) the "consisting

of" transition "closed" the claim to unrecited inactive ingredients; and (3) therefore, the claims did

not cover formulations having two or more inactive ingredients. At least one other court has

construed "pharmaceutically acceptable carrier" to mean "a conventional pharmaceutically

41

acceptable excipient or additive." To the extent this interpretation applied in the Nebivolol Patent Litigation, the Generic Competitors' products did not infringe for this additional reason.

145.    As a result of the foregoing, Forest could not prevail in proving literal infringement of the asserted claims of the '040 Patent. And, in light of the prosecution history of the '040 Patent, Forest could not prevail based on the doctrine of equivalents. In addition, Forest's invalidity defenses concerning the asserted claims of the '040 Patent were weak and it could not have prevailed against the Generic Competitors' invalidity arguments. As the Board explained during the prosecution of the '040 Patent:

> [The '362 Patent's] disclosure of compound 84, together with its designation "AB," appears to describe the individual RSSS, SRRR, RSRR and SRSS stereoisomers "just as surely as if they were identified in the reference by name."

The '362 Patent was prior art to the '040 Patent. In light of the '362 Patent's essentially explicit teaching of a mixture of "the individual RSSS, SRRR, RSRR and SRSS stereoisomers" of nebivolol, the asserted compositions in the '040 Patent were anticipated by, or obvious in view of, the prior art, including other pertinent prior art such as Van de Water *et al.*, Pharmacological and Hemodynamic Profile of Nebivolol, a Chemically Novel, Potent, and Selective B1-Adrenergic Antagonist, Journal of Cardiovascular Pharmacology, 11, No. 5, 552-563 (1988). Any purported evidence of secondary indicia of nonobviousness was insufficient to overcome the clear prima facie obviousness of the claims.

### E.    Forest Enters into Unlawful Reverse-Payment Agreements with the Generic Competitors

146.    Starting on October 24, 2012, Forest began entering into settlements with Generic Competitors to resolve the Nebivolol Patent Litigation.

147.    Forest's internal and external counsel have conceded that each of these settlements also included "side-deals." In a March 4, 2014, email between Forest's outside lawyers to Forest

in-house counsel Eric Agovino, Agovino informed external counsel: "All [Generic Competitor settlements] had side-deals (one was struck with Alkem, which is a related company with Indchemie)."

148.    The FTC also raised concerns.  Around the time of the merger, in May 2014, Forest received a Civil Investigatory Demand from the FTC seeking information about Defendants' Bystolic settlements with the Generic Competitors. Allergen's 10-K for the fiscal year ending December 31, 2018, stated: "We have also received requests for information and Statements of Objection in connection with investigations into settlements and other arrangements between competing pharmaceutical companies by the Federal Trade Commission and the European Competition Commission. For example, in May 2014, Forest received a Civil Investigatory Demand from the FTC requesting information about Forest's agreements with ANDA filers for Bystolic®."

149.    These side deals were also listed in Forest's Merger Agreement with Actavis as payments to resolve "material contracts" that on information and belief "involve payments . . . of consideration in excess of $15,000,000." In addition, Forest has also admitted that it reimbursed "certain of the Settling Defendants' legal costs in connection with the patent litigation." Accordingly, on information and belief, Forest paid each Generic Competitor at least $15,000,000, but likely more, in reverse payments to resolve the Nebivolol Patent Litigation and induce the Generic Competitors to quit the patent fight.

150.    ***Hetero***: The Hetero reverse payment included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd, and Hetero USA Inc. and Hetero Labs Ltd. dated October 24, 2012," plus payment for Hetero's expended litigation costs, and a "FINAL TERM SHEET between Hetero Drugs Ltd. and Forest

Laboratories Ireland Ltd. dated October 5, 2012, in connection with the settlement of BYSTOLIC patent dispute."

151.    On information and belief, in addition to the monies Forest paid Hetero for Hetero's expended litigation costs, pursuant to the "FINAL TERM SHEET," Forest paid Hetero more than $15,000,000.

152.    **_Torrent_**: The Torrent reverse payment included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Torrent Pharmaceuticals Ltd, and Torrent Pharma Inc. dated November 21, 2012," plus payment for Torrent's expended litigation costs, and a "PATENT ASSIGNMENT AGREEMENT between Torrent Pharmaceuticals Ltd and Forest Laboratories Holdings Ltd. dated November 21, 2012, in connection with the settlement of BYSTOLIC patent dispute."

153.    On information and belief, in addition to the monies Forest paid Torrent for Torrent's expended litigation costs, pursuant to the "PATENT ASSIGNMENT AGREEMENT," Forest paid Torrent more than $15,000,000.

154.    **_Alkem_**: The Alkem reverse payment included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Alkem Laboratories Ltd. dated November 27, 2012," plus payment for Alkem's expended litigation costs, and a "TERM SHEET between Alkem Laboratories Ltd., Indchemie Health Specialties Private Ltd., and Forest Laboratories Ireland Ltd. dated November 28, 2012, in connection with the settlement of BYSTOLIC patent dispute." Alkem and Forest also entered into an "AMENDMENT NO. 1 TO SETTLEMENT AGREEMENT . . . on January 9, 2013."

155.    On information and belief, in addition to the monies Forest paid Alkem for Alkem's expended litigation costs, pursuant to the Alkem "TERM SHEET," Forest paid Alkem more than $15,000,000.

156.    ***Indchemie***: The Indchemie reverse payment included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Indchemie Health Specialties Private Ltd. dated November 27, 2012," plus payment for Indchemie's expended litigation costs, and a "TERM SHEET between Alkem Laboratories Ltd., Indchemie Health Specialties Private Ltd., and Forest Laboratories Ireland Ltd. dated November 28, 2012, in connection with the settlement of BYSTOLIC patent dispute."

157.    On information and belief, in addition to the monies Forest paid Indchemie for Indchemie's expended litigation costs, pursuant to the Indchemie "TERM SHEET," Forest paid Indchemie more than $15,000,000.

158.    ***Glenmark***: The Glenmark reverse payment included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Glenmark Generics Inc., USA and Glenmark Generics Ltd. dated December 21, 2012," plus payment for Glenmark's expended litigation costs, and a "COLLABORATION AND OPTION AGREEMENT between Glenmark Pharmaceuticals S.A. and Forest Laboratories Holdings Ltd. dated December 21, 2012, in connection with the settlement of BYSTOLIC patent dispute."

159.    On information and belief, in addition to the monies Forest paid Glenmark for Glenmark's expended litigation costs, pursuant to the "COLLABORATION AND OPTION AGREEMENT," Forest paid Glenmark more than $15,000,000.

160.    ***Amerigen***: The Amerigen reverse payment included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and

Amerigen Pharmaceuticals, Inc. and Amerigen Pharmaceuticals, Ltd. dated July 18, 2013," plus payment for Amerigen's expended litigation costs, and a "BINDING TERM SHEET COLLABORATION AGREEMENT" between Forest Laboratories, Inc. and Amerigen Pharmaceuticals, Ltd. dated July 18, 2013, in connection with the settlement of BYSTOLIC patent dispute."

161.    On information and belief, in addition to the monies Forest paid Amerigen for Amerigen's expended litigation costs, pursuant to the "BINDING TERM SHEET COLLABORATION AGREEMENT," Forest paid Amerigen more than $15,000,000.

162.    **Watson**: The Watson reverse payment included the "SETTLEMENT AGREEMENT between Forest Laboratories, Inc. and Forest Laboratories Holdings, Ltd., and Watson Laboratories, Inc. (NV), Watson Laboratories, Inc. (DE), Watson Laboratories, Inc. (NY), Watson Laboratories, Inc. (CT), Watson Pharma, Inc., and Actavis, Inc. dated November 6, 2013," plus payment for Watson expended litigation costs, and "(a) the LETTER from Forest Laboratories, Inc. to Moksha8, Inc. dated November 1, 2013 and (b) TERMINATION AND RELEASE AGREEMENT between [Watson] and Moksha8, Inc. dated November 4, 2013, in connection with the settlement of BYSTOLIC patent dispute."

163.    On information and belief, in addition to the monies Forest paid Watson for Watson's expended litigation costs, pursuant to the "(a) the LETTER from Forest Laboratories, Inc. to Moksha8, Inc. dated November 1, 2013 and (b) TERMINATION AND RELEASE AGREEMENT between [Watson] and Moksha8, Inc.," Forest paid Watson more than $15,000,000.

164.    On information and belief, the value of each reverse payment exceeded Forest's avoided litigation costs.

165.    In exchange for these reverse payments, each Generic Competitor agreed not to compete with Forest in the market for nebivolol HCl, in which Forest had a monopoly, for so long as all others did so also, until September 17, 2021 (a mere three months prior to expiry of the '040 Patent).

166.    The purpose and effect of the reverse-payment agreements were to delay Forest from having to face lower-priced generic competition for years.

167.    But for the reverse-payment agreements, the Generic Competitors would have been ready, able, and willing to launch their generic versions of Bystolic much earlier.

168.    Specifically, the Generic Competitors would have launched by the later of: (a) June 2015, which was the expiry of the only other patent that Forest contended covered Bystolic (the '580 Patent), or (b) the date their ANDAs were finally approved.

169.    By operation of the CLPs, if *just one* Generic Competitor launched a generic version of Bystolic prior to September 17, 2021 pursuant to any of the three above scenarios, *all* of the other Generic Competitors would have entered the market.

170.    By about October 2012, when Forest and the Generic Competitors began entering into the reverse-payment agreements, Bystolic was generating hundreds of millions of dollars per year in revenues for Forest. Losing a substantial portion of that revenue stream in the event any of the Generic Competitors were to prevail on non-infringement or other defenses—or in the event that Forest had not induced the Generic Competitors with reverse payments to agree to delay launching generic Bystolic—would have drastically reduced Forest's profits. Thus, Forest had enormous incentives to avoid competition from the Generic Competitors by entering into reverse-payment agreements.

171.    Forest's willingness to provide large payments to each Generic Competitor in exchange for a multi-year delay in competition amounted to an agreement to share with the Generic Competitors the monopoly profits from sales of branded Bystolic at supra-competitive levels.

## VIII.    MARKET POWER AND DEFINITION

172.    As stated above, the pharmaceutical marketplace is characterized by a "disconnect" between product selection and the payment obligation. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Bystolic, to patients without a prescription. The prohibition on dispensing certain products without a prescription creates this disconnect. The patient's doctor chooses which product the patient will buy while the patient (and in most cases his or her insurer) has the obligation to pay for the product.

173.    Brand manufacturers, including Defendants, exploit this price disconnect by employing large sales forces that visit doctors' offices and persuade them to prescribe the brand manufacturers' products. These sales representatives do not advise doctors of the cost of the branded products. Studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are largely insensitive to price differences because they do not pay for the products.  The result is a marketplace in which price plays a comparatively unimportant role in product selection.

174.    The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand—the extent to which unit sales go down when price goes up.  This reduced-price elasticity, in turn, gives brand manufacturers the ability to raise prices substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs is what economists and antitrust courts refer to as market power. The result of these pharmaceutical

market imperfections and marketing practices is that brand manufacturers gain and maintain market power with respect to many branded prescription pharmaceuticals, including Bystolic.

175.    Defendants had and continue to have monopoly power in the market for Bystolic because they have the power to exclude competition and/or raise or maintain the price of nebivolol HCl at supra-competitive levels without losing enough sales to make supra-competitive prices unprofitable.

176.    The size of the payment from a branded drug manufacturer to a prospective generic is itself a strong indicator of power—namely, the power to charge prices higher than the competitive level. And a firm that lacks monopoly power is not likely to pay large sums to induce others to stay out of the market.

177.    A small but significant, non-transitory increase to the price of brand Bystolic would not have caused a significant loss of sales to non-nebivolol HCl products sufficient to make the price increase unprofitable.

178.    Brand Bystolic does not exhibit significant, positive cross-elasticity of demand with respect to price with any other nebivolol HCl product for the treatment of high blood pressure or hypertension or other illnesses treated by Bystolic other than AB-rated generic versions of Bystolic.

179.    Brand Bystolic is differentiated from all other nebivolol HCl products and all other high blood pressure or hypertension products other than the AB-rated generic versions of brand Bystolic.

180.    Defendants needed to control only brand Bystolic and its AB-rated generic equivalents, and no other products, in order to maintain the price of nebivolol HCl profitably at supra-competitive prices. Only the market entry of competing, AB-rated generic versions would

render Defendants unable to profitably maintain their prices for Bystolic without losing substantial sales.

181.    Defendants sold brand Bystolic at prices well in excess of marginal costs and in excess of the competitive price, and, therefore, Defendants enjoyed high profit margins.

182.    Defendants had, and exercised, the power to exclude generic competition to brand Bystolic.

183.    At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected branded Bystolic from the forces of price competition.

184.    There is direct evidence of market power and anticompetitive effects available in this case sufficient to show Defendants' ability to control the price of Bystolic, and to exclude relevant competitors, without the need to show the relevant antitrust markets. The direct evidence consists of, *inter alia*, the following facts: (a) generic Bystolic would have entered the market at a much earlier date, at a substantial discount to brand Bystolic, but for Defendants' anticompetitive conduct; (b) Defendants' gross margin on Bystolic (including the costs of ongoing research/development and marketing) at all relevant times was very high; and (c) Defendants never lowered the price of Bystolic to the competitive level in response to the pricing of other brand or generic drugs.

185.    To the extent proof of monopoly power by defining a relevant product market is required, Plaintiff alleges that the relevant antitrust market is the market for Bystolic and its AB-rated generic equivalents.

186.    Defendants' anticompetitive reverse payments to the Generic Competitors demonstrate that Defendants enjoyed market and/or monopoly power with respect to nebivolol HCl.

187.    The United States, the District of Columbia, and the U.S. territories constitute the relevant geographic market.

188.    Defendants' market share in the relevant market is 100%, implying substantial monopoly power.

## IX.    MARKET EFFECTS

189.    Defendants willfully and unlawfully maintained their market power by engaging in an overarching scheme to exclude competition. Defendants designed a scheme to delay competition, to further Defendants' anticompetitive purpose of forestalling generic competition against Bystolic, in which the Generic Competitors cooperated in order to increase their own profits. Defendants carried out the scheme with the anticompetitive intent and effect of maintaining supra-competitive prices for nebivolol HCl tablets.

190.    Defendants' acts and practices had the purpose and effect of restraining competition unreasonably and injuring competition by protecting brand Bystolic. These actions allowed Defendants to maintain a monopoly and exclude competition in the market for Bystolic and its AB-rated generic equivalents, to the detriment of Plaintiff and all other members of the proposed Class.

191.    Defendants' exclusionary conduct delayed generic competition and unlawfully enabled Defendants to sell Bystolic without further generic competition. Were it not for Defendants' illegal conduct, one or more additional generic versions of Bystolic would have entered the market sooner.

192.    Defendants' illegal acts and conspiracy to delay generic competition for Bystolic caused Plaintiff and all Class members to pay more than they would have paid for nebivolol HCl absent this illegal conduct.

193.    If generic competitors had not been unlawfully prevented from entering the market earlier and competing in the relevant markets, end-payor purchasers, such as Plaintiff and Class members, would have paid less for nebivolol HCl by (a) paying lower prices on their remaining brand purchases of Bystolic, (b) substituting purchases of less-expensive generic Bystolic for their purchases of more-expensive brand Bystolic, and/or (c) purchasing generic Bystolic at lower prices sooner.

194.    Thus, Defendants' unlawful conduct deprived Plaintiff and members of the Class of the benefits from the competition that the antitrust laws are designed to ensure.

## X.    ANTITRUST IMPACT AND IMPACT ON INTERSTATE COMMERCE

195.    During the relevant time period, Defendants manufactured, promoted, sold, distributed, and shipped Bystolic across state and national lines throughout the United States in a continuous and uninterrupted flow of interstate commerce.

196.    During the relevant time period, Plaintiff and members of the proposed Class purchased substantial amounts of nebivolol HCl indirectly from Defendants. As a result of Defendants' illegal conduct, Plaintiff and the members of the Class were compelled to pay, and did pay, artificially inflated prices for nebivolol HCl. Those prices were substantially greater than the prices that members of the Class would have paid absent the illegal conduct alleged herein, because: (1) the price of branded Bystolic was artificially inflated by Defendants' illegal conduct, (2) Class members were deprived of the opportunity to purchase lower-priced generic versions of Bystolic sooner, and/or (3) the price of AB-rated Bystolic was artificially inflated by Defendants' illegal conduct.  The supra-competitive prices were paid at the point of sale, which is where Plaintiff and the proposed Class suffered antitrust impact.

197.    As a consequence, Plaintiff and the proposed members of the Class have sustained substantial damages to their business and property in the form of overcharges. The full amount and forms of components of such damages will be calculated after discovery and upon proof at trial.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charges to end payors such as Plaintiff and the proposed members of the Class.

198.    General economic theory recognizes that any overcharge at a higher level of distribution generally results in higher prices at every level below. According to Professor Hovenkamp, "[e]very person at every stage in the chain will be poorer as a result of the monopoly price at the top."  Professor Hovenkamp also acknowledges that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."

199.    Further, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end payors. Wholesalers and retailers passed on the inflated prices of Bystolic to Plaintiff and the Class of end-payors defined herein. Defendants' anticompetitive actions enabled them to indirectly charge end-payors prices in excess of what they otherwise would have been able to charge absent their unlawful actions with the Generic Competitors.

200.    The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct individually and with the Generic Competitors.

201.    The inflated prices the proposed end-payor Class paid are traceable to, and the foreseeable result of, the overcharges by Defendants.

202.     During the relevant time period, Defendants used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and/or interstate and foreign wire commerce. All Defendants engaged in illegal activities, as charged in herein, within the flow of, and substantially affecting, interstate commerce.

203.     Defendants' conduct was within the flow of, and was intended to have and did have a substantial effect on, interstate commerce of the United States, including in this District.

204.     During the Class Period, each Defendant, or one or more of each Defendant's affiliates, used the instrumentalities of interstate commerce to join or effectuate the scheme. The scheme in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## XI.    EFFECT ON INTRASTATE COMMERCE

205.     During the relevant time period, branded Bystolic, manufactured and sold by Defendants, was shipped into each state and was sold to or paid for by end-payor Class members.

206.     During the relevant time period, in connection with the purchase and sale of branded Bystolic, monies exchanged hands and business communications and transactions occurred in each state.

207.     Defendants' conduct as set forth in this Complaint had substantial effects on intrastate commerce in that, *inter alia*, retailers within each state were foreclosed from offering cheaper Bystolic and generic nebivolol HCl to members of the proposed Class purchasing inside each respective state, and Defendants entered into an unlawful anticompetitive agreement that affected commerce in each state.

## XII.    CLASS ACTION ALLEGATIONS

208.    Plaintiff brings this action on its own behalf and on behalf of all others similarly situated as a class action under Fed. R. Civ. P. 23(a) and 23(b)(3), seeking damages and/or restitution pursuant to the common law of unjust enrichment and the antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states listed below, as representative of the following class ("Damages Class"):

> All persons or entities that indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price for Bystolic, other than for resale, in the States, Commonwealths, or Territories of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, or Wyoming at any time during the period from June 2, 2015 through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

209.    Plaintiff further brings this action on its own behalf and on behalf of all others similarly situation under Fed. R. Civ. P. 23(a) and 23(b)(2), seeking injunctive relief under the federal antitrust laws, as representative of the following class ("Injunctive Class"):

> All persons or entities in the United States and its territories that purchased, paid, and/or provided reimbursement for some or all of the purchase price for Bystolic, other than for resale, at any time during the period from June 2, 2015 through and until the anticompetitive effects of Defendants' challenged conduct cease.

210.    The Damages Class and Injunctive Class are together referred to in this Complaint as the "Class."

211.    Excluded from the Class are:

    a)    Defendants and their counsel, officers, directors, management, employees, subsidiaries, and affiliates;

    b)    all federal governmental entities;

    c)     all persons or entities who purchased Bystolic for purposes of resale;

    d)     fully insured health plans (*i.e.*, health plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members);

    e)     any "flat co-pay" consumers whose purchases of Bystolic were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price;

    f)     pharmacy benefit managers; and

    g)     all judges assigned to this case and any members of their immediate families.

212. Members of the Class are so numerous and widely geographically dispersed throughout the United States and its territories that joinder is impracticable. Plaintiff believes that there are hundreds of thousands of members of the Class, with a more precise number to be determined in discovery and at trial. Further, the identities of Class members will be readily ascertainable through business records kept in regular order.

213. Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct by Defendants, and all paid artificially inflated prices for Bystolic and were deprived of the benefits of competition from less expensive generic versions as a result of Defendants' conduct.

214. Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, the Class.

215. Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular experience with class action litigation involving the pharmaceutical industry.

216.    Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

217.    Questions of law and fact common to the Class include:

a)    whether the conduct alleged herein constitutes a violation of the antitrust laws;

b)    whether Defendants conspired with each of their Generic Competitors to suppress generic competition to Bystolic;

c)    whether Defendants' anticompetitive scheme suppressed generic competition to Bystolic;

d)    whether Defendants' challenged conduct fixed, raised, maintained, or stabilized the price of nebivolol HCl;

e)    as to those parts of Defendants' challenged conduct for which such justifications may be offered, whether there exist cognizable, non-pretextual procompetitive justifications, which Defendants' challenged conduct was the least restrictive means of achieving, that offset the harm to competition in the markets in which Bystolic is sold;

f)    whether a relevant antitrust market needs to be defined in this case in light of the existence of direct proof of Defendants' power to exclude generic competition and charge supra-competitive prices for Bystolic;

g)    to the extent a relevant antitrust market or markets needs to be defined, what the definition of the relevant antitrust market for analyzing Defendants' monopoly power is, and whether Defendants had monopoly power in the relevant antitrust market;

h)    whether Defendants illegally obtained or maintained monopoly power in the relevant market;

i)    whether Defendants' actions were, on balance, unreasonable restraints of trade;

j)    determination of a reasonable estimate of the amount of delay Defendants' unlawful monopolistic, unfair, and unjust conduct caused;

k)    whether Defendants' scheme, in whole or in part, has substantially affected interstate commerce;

l)   whether Defendants' compensation to the Generic Competitors was large, unexplained, and/or unjustified;

m)   whether the reverse-payment agreement created a bottleneck to further delay generic competition;

n)   whether the reverse payment harmed competition;

o)   whether Defendants' unlawful monopolistic conduct was a substantial contributing factor in causing some amount of delay of the entry of AB-rated generic Bystolic;

p)   whether Defendants' scheme, in whole or in part, and to what extent, caused antitrust injury to the business or property of Plaintiff and members of the Class in the nature of overcharges; and

the quantum of overcharges paid by the Class in the aggregate.

218.   Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

219.   Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## XIII.   FRAUDULENT CONCEALMENT AND CONTINUING VIOLATIONS

### A.   Defendants Fraudulently Concealed Their Anticompetitive Scheme

220.   Due to Defendants' fraudulent concealment of their unlawful conduct, Plaintiff and members of the Class are entitled to recover damages from the beginning of the Class Period. Plaintiff and members of the Class had no knowledge of Defendants' unlawful self-

concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence.

221.    Defendants' scheme was self-concealing, and Defendants employed deceptive tactics and techniques of secrecy to avoid detection of, and to fraudulently conceal, their contract, combination, conspiracy, and scheme.

222.    On information and belief, Defendants did not disclose the material terms of their agreements with the Generic Competitors—including the size and value of the payments to the Generic Competitors—in public filings. On information and belief, the earliest Plaintiff could have been placed on notice of the claims in this complaint was March 2019, when the full February 2014 Forest-Allergan Agreement and Plan of Merger and related internal communications were publicly disclosed in the *In re Namenda Direct Purchaser Antitrust Litigation*, No. 15-cv-7488 (S.D.N.Y.). On information and belief, publicly disclosed versions of the February 2014 Agreement and Plan of Merger, for example, did not include the Company Disclosure Letter, which identified Defendants' patent settlements with the Generic Competitors as settlement agreements each with consideration of at least $15 million (but likely more).

223.    Because of this failure to disclose, Plaintiff and members of the Class could not have had knowledge of the scheme and conspiracy prior to March 2019, when the Agreement and Plan of Merger was fully disclosed; the facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed were not available; and if they would have had the facts or information to cause them to conduct an investigation, any such investigation would not have revealed the existence of Defendants' unlawful conspiracy.

224.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Plaintiff's and the Class's claims have been tolled.

**B.    Defendants' Continuing Violations of the Antitrust Laws**

225.    By virtue of Defendants' continued adherence to the unlawful patent settlement agreements with the Generic Competitors, Defendants have reaffirmed and perpetuated their anticompetitive scheme.

226.    Defendants continued sales of Bystolic at monopoly prices in the absence of the competition from Generic Competitors, and each such sale created a claim entitling Plaintiff and members of the Class relief.

## XIV.    COMPLIANCE WITH NOTICE AND DEMAND REQUIREMENTS

227.    Pursuant to Arizona Revised Statute § 44-1415; Hawaii Revised Statute § 480-13.3(a); 815 Illinois Compiled Statutes § 505/10a(d); Massachusetts General Laws Ann. ch. 93A § 10; Minnesota Statutes Ann. § 325D.63; Montana Code Ann. § 30-14-133; Nevada Revised Statute § 598A.210(3); New Hampshire Revised Statutes Ann. § 358-A:10; New York General Business Law § 340(5); Oregon Revised Statutes Ann. § 646.780; Rhode Island General Laws § 6-36-21; and Utah Code § 76-10-3109, on or about August 19, 2020, Plaintiff, through its counsel, sent letters to:

    a)    Mark Brnovich, Attorney General of Arizona;

    b)    Clare E. Connors, Attorney General of Hawaii;

    c)    Kwame Raoul, Attorney General of Illinois;

    d)    Maura Healey, Attorney General of Massachusetts;

    e)    Keith Ellison, Attorney General of Minnesota;

    f)    Tim Fox, Attorney General of Montana;

    g)    Aaron Ford, Attorney General of Nevada;

    h)    Gordon MacDonald, Attorney General of New Hampshire;

    i)    Letitia James, Attorney General of New York;

j)      Ellen Rosenblum, Attorney General of Oregon;

k)      Peter F. Neronha, Attorney General of Rhode Island; and

l)      Sean Reyes, Attorney General of Utah,

228.    informing them of the existence of this Class Action Complaint, identifying the relevant state antitrust and/or consumer protection provisions, and enclosing a copy of this Class Action Complaint.

229.    On or about August 19, 2020, Plaintiff, through its counsel, sent a demand letter to Defendants that satisfies the requirements of West Virginia Code § 46A- 6-106(c). The demand letter identified the claimant as Plaintiff on behalf of itself and all end payor purchasers of Bystolic; described the unfair or deceptive acts or practices committed by Defendants through their entry into unlawful and anticompetitive agreements with the Generic Competitors; described the injury suffered (increased prices for Bystolic because of the delayed entry of a generic to the market); set forth a demand for relief (multiple damages, attorneys' fees, litigation costs, and other relief); and requested an offer to cure within the statutorily prescribed time.

230.    On or about August 19, 2020, Plaintiff, through its counsel, also sent a demand letter to Defendants that satisfies the requirements of 10 Me. Rev. Stat. tit. 5 § 213-1-A. The demand letter identified the claimant as Plaintiff on behalf of itself and all end payor purchasers of Bystolic; described the unfair or deceptive acts or practices committed by Defendants through their entry into unlawful and anticompetitive agreements with the Generic Competitors; described the injury suffered (increased prices for Bystolic because of the delayed entry of a generic to the market); set forth a demand for relief (multiple damages, attorneys' fees, litigation costs, and other relief); and requested an offer to cure within the statutorily prescribed time.

231.    The demand letter requirement of Section 9 of Massachusetts General Laws Annotated Chapter 93A does not apply to Defendants because Defendants have not identified a place of business or assets within Massachusetts. In an abundance of caution, however, Plaintiff, through its counsel, and on behalf of itself and all others similarly situated, sent Defendants a written demand for relief on or about August 19, 2020. The demand letter identified the claimant as Plaintiff on behalf of itself and all end payor purchasers of Bystolic; described the unfair or deceptive acts or practices committed by Defendants through their entry into unlawful and anticompetitive agreements with the Generic Competitors; described the injury suffered (increased prices for Bystolic because of the delayed entry of a generic to the market); set forth a demand for relief (multiple damages, attorneys' fees, litigation costs, and other relief); and requested an offer to cure within the statutorily prescribed time.

232.    The demand letter requirement of Section 9 of Massachusetts General Laws Annotated Chapter 93A does not apply to claims brought by Plaintiff because Plaintiff is "engage[d] in the conduct of any trade or commerce" and therefore can bring its claims under Massachusetts General Laws Annotated 93A § 11. Plaintiff is engaged in trade or commerce because it purchased, paid, and/or provided reimbursement for some or all of the purchase price for Bystolic purchased in Massachusetts and/or by Class members residing in Massachusetts. Section 11 does not require notice. *See Nader Citron*, 372 Mass. 96, 101 (1977). In an abundance of caution, however, Plaintiff, through its counsel, and on behalf of itself and all others similarly situated, sent Defendants a written demand for relief as described in the prior paragraph.

## XV.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Combination and Conspiracy in Restraint of Trade
### (Asserted Against All Defendants and Unnamed (as defendants) Generic Competitors/Co-Conspirators)

233.    Plaintiff incorporates the preceding paragraphs by reference.

234.    This claim is pled against all Defendants as well as each of the unnamed (as defendants) Generic Competitors/Co-Conspirators.

235.    Defendants and each of the Generic Competitors committed at least one overt act in furtherance of the conspiracy.

236.    Defendants unlawfully engaged in a continuing illegal contract, combination, and conspiracy to restrain trade in the nebivolol HCl market by engaging in an anticompetitive scheme to keep generic equivalents from the market and to allocate the market between horizontal competitors.

237.    Defendants accomplished this scheme by, *inter alia*, (1) entering into illegal agreements which delayed the entry of generic Bystolic in order to lengthen the period in which Defendants' brand Bystolic could monopolize the market and make supra-competitive profits; (2) raising and maintaining the prices of Bystolic so that Plaintiff and Class members would pay for Bystolic at supra-competitive prices; (3) unlawfully agreeing to divide a market and delay price reductions and generic competition for Bystolic; (4) allocating to Defendants 100% of the U.S. sales of nebivolol HCl until September 17, 2021; and (5) entering into illegal settlement agreements to cover the terms of the agreement allocating the market for nebivolol HCl in the United States and its territories.

238.    The agreements between Defendants are horizontal market allocation and price fixing agreements between actual or potential competitors and are illegal *per se* under state

antitrust laws. Alternatively, this Complaint alleges that these agreements are an unreasonable restraint of trade, in violation of state antitrust laws, under a "quick look" or "rule of reason" analysis.

239.    Alternatively, Defendants' agreements are presumptively anticompetitive reverse-payment settlements, subject to "quick look" rule of reason scrutiny, because Defendants provided substantial consideration in exchange for each generic manufacturer's agreement to delay market entrance.

240.    Through the agreements, Defendants and the Generic Competitors joined in an anticompetitive scheme as co-conspirators. The reverse-payment agreements are and were a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade in the relevant market, the purpose and effect of which was to: (a) allocate all sales of nebivolol HCl in the United States and its territories to Defendants until September 17, 2021; (b) prevent the sale of any generic version of nebivolol HCl in the United States and its territories until September 17, 2021; and (c) fix, raise, and/or maintain the price at which Plaintiff and all members of the proposed Class would pay for nebivolol HCl.

241.    Under Defendants' reverse-payment agreements, Defendants paid the Generic Competitors financial inducements through large, unexplained, and unjustified payments that vastly exceed the cost of avoided litigation and are not otherwise explained by the value of any services provided by the Generic Competitors to Defendants (other than Generic Competitors' agreement to delay launching their generic Bystolic). There are no valid, non-pretextual, procompetitive business justifications for the settlement agreements, nor for the payments to the Generic Competitors under the settlement agreements. Even if there were some conceivable

justification, the settlement agreements and the payments flowing to the Generic Competitors under the agreements were not reasonably necessary to achieve settlement.

242.    There is no legitimate, non-pretextual, procompetitive business justification for the reverse payments made by Defendants that outweighs their harmful effects. Specifically, under *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2237 (2013), a patent settlement agreement between a brand and generic manufacturer may be unlawful when the brand provides the generic manufacturer a "large and unjustified" payment in exchange for the generic manufacturer dropping its challenge to the brand manufacturer's patents. This is particularly the case when the size of the payment exceeds any saved or avoided litigation costs.

243.    Here, in exchange for the Generic Competitors' agreements to delay entering the market until September 17, 2021, the Generic Competitors each received a payment that, on information and belief, was at least $15 million. The value transferred under those agreements exceeded the costs of continued litigation or any arguably procompetitive benefits, and thus was "large and unjustified." Accordingly, the agreements were and are unlawful.

244.    In exchange for these payments, the Generic Competitors agreed to, and did, delay introduction of their generic Bystolic in the United States.

245.    The anticompetitive consequences of Defendants' reverse-payment agreements are sufficiently great and sufficiently unrelated to the settlement of the underlying patent dispute, to amount to an unlawful reverse-payment agreement, as evidenced by, *inter alia*, the following:

  a)    Delaying the entry of a generic Bystolic lengthened the period in which Defendants' branded Bystolic could monopolize the market and make supra-competitive profits;

65

b) The agreements created bottlenecks that prevented and delayed generic entry by other generic manufacturers; and

c) There were no countervailing pro-competitive benefits from the agreements.

246. The goal, purpose, and effect of Defendants' scheme was to prevent and delay the sale of nebivolol HCl products in the United States and its territories at prices significantly below Defendants' prices for branded Bystolic, thereby effectively preventing the price of nebivolol HCl products from declining dramatically.

247. The goal, purpose, and effect of Defendants' scheme was also to maintain and extend Defendants' monopoly power with respect to nebivolol HCl products. The illegal scheme allowed Defendants to continue charging supra-competitive prices for nebivolol HCl products, without a substantial loss of sales, reaping substantial unlawful monopoly profits.

248. Plaintiff and members of the Class purchased substantial amounts of Bystolic indirectly from Defendants.

249. As a result of Defendants' illegal conduct, Plaintiff and members of the Class were compelled to pay, and did pay, more than they would have paid for their nebivolol HCl products absent Defendants' illegal conduct. But for Defendants' illegal conduct, competitors would have begun selling generic Bystolic sooner, and prices for nebivolol HCl products would have been lower, sooner.

250. Defendants' conduct violated the following state antitrust laws:

a) Ariz. Rev. Stat. Ann. §§ 44-1402, *et seq.*, with respect to purchases of Bystolic in Arizona by Class members and/or purchases of Bystolic by Class members residing in Arizona.

b)      Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases of Bystolic in California by Class members and/or purchases of Bystolic by Class members residing in California.

c)      C.G.S.A. §§ 35-26 and 28, *et seq.*, with respect to purchases of Bystolic in Connecticut by Class members and/or purchases of Bystolic by Class members residing in Connecticut.

d)      D.C. Code §§ 28-4502, *et seq.*, with respect to purchases of Bystolic in the District of Columbia by Class members and/or purchases of Bystolic by Class members residing in the District of Columbia.

e)      Haw. Rev. Stat. §§ 480-2, 480-4, *et seq.*, with respect to purchases of Bystolic in Hawaii by Class members and/or purchases of Bystolic by Class members residing in Hawaii.

f)      740 Ill. Comp. Stat. §§ 10/3, *et seq.*, with respect to purchases of Bystolic in Illinois by Class members and/or purchases of Bystolic by Class members residing in Illinois.

g)      Iowa Code §§ 553.4, *et seq.*, with respect to purchases of Bystolic in Iowa by Class members and/or purchases of Bystolic by Class members residing in Iowa.

h)      Kan. Stat. Ann. §§ 50-112, *et seq.*, with respect to purchases of Bystolic in Kansas by Class members and/or purchases of Bystolic by Class members residing in Kansas.

i)      Me. Rev. Stat. Ann. 10 §§ 1101, *et seq.*, with respect to purchases of
Bystolic in Maine by Class members and/or purchases of Bystolic by
Class members residing in Maine.

j)      MD Code Ann., Com. Law, §§ 11-204, *et seq.*, with respect to purchases
of Bystolic in Maryland by Class members and/or purchases of Bystolic
by Class members residing in Maryland.

k)      Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases of
Bystolic in Michigan by Class members and/or purchases of Bystolic by
Class members residing in Michigan.

l)      Minn. Stat. §§ 325D.51, *et seq.*, with respect to purchases of Bystolic in
Minnesota by Class members and/or purchases of Bystolic by Class
members residing in Minnesota.

m)      Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Bystolic
in Mississippi by Class members and/or purchases of Bystolic by Class
members residing in Mississippi.

n)      Neb. Rev. Stat. §§ 59-801, *et seq.*, with respect to purchases of Bystolic in
Nebraska by Class members and/or purchases of Bystolic by Class
members residing in Nebraska.

o)      Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of
Bystolic in Nevada by Class members and/or purchases of Bystolic by
Class members residing in Nevada.

p)    N.H. Rev. Stat. Ann. §§ 356:2, *et seq.*, with respect to purchases of
Bystolic in New Hampshire by Class members and/or purchases of
Bystolic by Class members residing in New Hampshire.

q)    N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of Bystolic in
New Mexico by Class members and/or purchases of Bystolic by Class
members residing in New Mexico.

r)    N.Y. Gen. Bus. Law § 340 with respect to purchases of Bystolic in New
York by Class members and/or purchases of Bystolic by Class members
residing in New York.

s)    N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of Bystolic in
North Carolina by Class members and/or purchases of Bystolic by Class
members residing in North Carolina.

t)    N.D. Cent. Code Ann. §§ 51-08.1-02, *et seq.*, with respect to purchases of
Bystolic in North Dakota by Class members and/or purchases of Bystolic
by Class members residing in North Dakota.

u)    Ohio Rev. Code Ann. § 1331.01, *et. seq.*, with respect to purchases of
Bystolic in Ohio by Class members and/or purchases of Bystolic by Class
members residing in Ohio.

v)    Or. Rev. Stat. §§ 646.725, *et seq.*, with respect to purchases of Bystolic in
Oregon by Class members and/or purchases of Bystolic by Class members
residing in Oregon.

w)    R.I. Gen. Laws §§ 6-36-4, *et seq.*, with respect to purchases of Bystolic in Rhode Island by Class members and/or purchases of Bystolic by Class members residing in Rhode Island.

x)    S.D. Codified Laws §§ 37-1-3.1, *et seq.*, with respect to purchases of Bystolic in South Dakota by Class members and/or purchases of Bystolic by Class members residing in South Dakota.

y)    Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Bystolic in Tennessee by Class members and/or purchases of Bystolic by Class members residing in Tennessee.

z)    Utah Code Ann. §§ 76-10-3104, *et seq.*, with respect to purchases of Bystolic in Utah by Class members and/or purchases of Bystolic by Class members residing in Utah.

aa)    W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases of Bystolic in West Virginia by Class members and/or purchases of Bystolic by Class members residing in West Virginia.

bb)    Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Bystolic in Wisconsin by Class members and/or purchases of Bystolic by Class members residing in Wisconsin.

251.    Plaintiff and the Class members have been injured in their business or property by Defendants' antitrust violations. Their injuries consist of (1) being denied the opportunity to purchase lower-priced generic versions of Bystolic and (2) paying higher prices for branded Bystolic than they would have paid in the absence of Defendants' wrongful conduct. These

injuries are of the type the above antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

252.    Plaintiff and members of the Class seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

253.    Defendants are jointly and severally liable for all damages suffered by Plaintiff and members of the Class.

## SECOND CLAIM FOR RELEIF
### Monopolization and Monopolistic Scheme Under State Law
### (Asserted Against All Defendants)

254.    Plaintiff incorporates by reference the preceding allegations.

255.    As described above, Defendants have possessed and continue to possess monopoly power nationwide and in each of the United States and its territories in the market for nebivolol HCl.  No other manufacturer will sell a competing version of Bystolic before September 17, 2021.

256.    At all relevant times, Defendants have possessed substantial market power (*i.e.*, monopoly power) in the relevant market. Defendants have possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

257.    Through their overarching anticompetitive scheme, as alleged above, Defendants have willfully maintained their monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen or a historic accident, and thereby have injured Plaintiff and the Class. Defendants' anticompetitive conduct was done with the specific intent to maintain their monopoly in the market for Bystolic in the United States.

258.    Defendants knowingly and intentionally engaged in this anticompetitive scheme to monopolize the nebivolol HCl market as described above. Defendants accomplished this scheme by, *inter alia*, (1) allocating to themselves 100% of the market for nebivolol HCl in all strengths in the United States until September 17, 2021; (2) entering into illegal agreements which delayed

the entry of generic Bystolic in order to lengthen the period in which Defendants' branded Bystolic could monopolize the market and make supra-competitive profits; and (3) fixing, raising, and maintaining the prices so that Plaintiff and proposed Class members would pay for Bystolic at supra-competitive prices.

259.    The goal, purpose, and effect of Defendants' scheme was to prevent and delay the sale of nebivolol HCl products in the United States at prices significantly below Defendants' prices for Bystolic, thereby effectively preventing the price of nebivolol HCl products from declining dramatically.

260.    The goal, purpose, and effect of Defendants' scheme was also to maintain and extend its monopoly power with respect to nebivolol HCl products. Defendants' illegal scheme allowed them to continue charging supra-competitive prices for nebivolol HCl products, without a substantial loss of sales, reaping substantial unlawful monopoly profits.

261.    Plaintiff and members of the proposed Class purchased substantial amounts of Bystolic indirectly from Defendants.

262.    As a result of Defendants' illegal conduct, Plaintiff and members of the proposed Class were compelled to pay, and did pay, more than they would have paid for their nebivolol HCl products absent Defendants' illegal conduct. But for Defendants' illegal conduct, competitors would have begun selling generic Bystolic sooner, and prices for nebivolol HCl products would have been lower, sooner.

263.    Had the Generic Competitors entered the market and lawfully competed with Defendants, Plaintiff and other members of the proposed Class would have substituted lower-priced generic nebivolol HCl products for the higher-priced brand-name Bystolic for some or all

of their nebivolol HCl products requirements, and/or would have paid lower prices on their remaining Bystolic and/or AB-rated bioequivalent purchases.

264.    By engaging in the foregoing conduct, Defendants violated the following state antitrust laws:

a)    Ariz. Rev. Stat. Ann. §§ 44-1403, *et seq.*, with respect to purchases of Bystolic in Arizona by Class members and/or purchases of Bystolic by Class members residing in Arizona.

b)    Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases of Bystolic in California by Class members and/or purchases of Bystolic by Class members residing in California.

c)    C.G.S.A. §§ 35-27, *et seq.*, with respect to purchases of Bystolic in Connecticut by Class members and/or purchases of Bystolic by Class members residing in Connecticut.

d)    D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of Bystolic in the District of Columbia by Class members and/or purchases of Bystolic by Class members residing in the District of Columbia.

e)    Haw. Rev. Stat. §§ 480-2, 480-9, *et seq.*, with respect to purchases of Bystolic in Hawaii by Class members and/or purchases of Bystolic by Class members residing in Hawaii.

f)    740 Ill. Comp. Stat. §§ 10/3, *et seq.*, with respect to purchases of Bystolic in Illinois by Class members and/or purchases of Bystolic by Class members residing in Illinois.

g)    Iowa Code §§ 553.5, *et seq.*, with respect to purchases of Bystolic in Iowa by Class members and/or purchases of Bystolic by Class members residing in Iowa.

h)    Kan. Stat. Ann. §§ 50-112, 50-161(b), *et seq.*, with respect to purchases of Bystolic in Kansas by Class members and/or purchases of Bystolic by Class members residing in Kansas.

i)    Me. Rev. Stat. Ann. 10 §§ 1102, *et seq.*, with respect to purchases of Bystolic in Maine by Class members and/or purchases of Bystolic by Class members residing in Maine.

j)    MD Code Ann., Com. Law, §§ 11-204, *et seq.*, with respect to purchases of Bystolic in Maryland by Class members and/or purchases of Bystolic by Class members residing in Maryland.

k)    Mich. Comp. Laws Ann. §§ 445.773, *et seq.*, with respect to purchases of Bystolic in Michigan by Class members and/or purchases of Bystolic by Class members residing in Michigan.

l)    Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. §§ 8.31, *et seq.*, with respect to purchases of Bystolic in Minnesota by Class members and/or purchases of Bystolic by Class members residing in Minnesota.

m)    Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Bystolic in Mississippi by Class members and/or purchases of Bystolic by Class members residing in Mississippi.

n)      Neb. Rev. Stat. §§ 59-802, *et seq.*, with respect to purchases of Bystolic in Nebraska by Class members and/or purchases of Bystolic by Class members residing in Nebraska.

o)      Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Bystolic in Nevada by Class members and/or purchases of Bystolic by Class members residing in Nevada.

p)      N.H. Rev. Stat. Ann. §§ 356:3, *et seq.*, with respect to purchases of Bystolic in New Hampshire by Class members and/or purchases of Bystolic by Class members residing in New Hampshire.

q)      N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of Bystolic in New Mexico by Class members and/or purchases of Bystolic by Class members residing in New Mexico.

r)      N.Y. Gen. Bus. Law § 340 with respect to purchases of Bystolic in New York by Class members and/or purchases of Bystolic by Class members residing in New York.

s)      N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of Bystolic in North Carolina by Class members and/or purchases of Bystolic by Class members residing in North Carolina.

t)      N.D. Cent. Code Ann. §§ 51-08.1-03, *et seq.*, with respect to purchases of Bystolic in North Dakota by Class members and/or purchases of Bystolic by Class members residing in North Dakota.

u)   Or. Rev. Stat. §§ 646.730, *et seq.*, with respect to purchases of Bystolic in Oregon by Class members and/or purchases of Bystolic by Class members residing in Oregon.

v)   R.I. Gen. Laws §§ 6-36-5, *et seq.*, with respect to purchases of Bystolic in Rhode Island by Class members and/or purchases of Bystolic by Class members residing in Rhode Island.

w)   S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases of Bystolic in South Dakota by Class members and/or purchases of Bystolic by Class members residing in South Dakota.

x)   Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Bystolic in Tennessee by Class members and/or purchases of Bystolic by Class members residing in Tennessee.

y)   Utah Code Ann. §§ 76-10-3104, *et seq.*, with respect to purchases of Bystolic in Utah by Class members and/or purchases of Bystolic by Class members residing in Utah.

z)   W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases of Bystolic in West Virginia by Class members and/or purchases of Bystolic by Class members residing in West Virginia.

aa)   Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Bystolic in Wisconsin by Class members and/or purchases of Bystolic by Class members residing in Wisconsin.

265.   Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this claim. Their injuries consist of:

(1) being denied the opportunity to purchase lower-priced generic nebivolol HCl products, sooner, and (2) paying higher prices for nebivolol HCl products than they would have paid in the absence of Defendants' conduct.  These injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

266.    Plaintiff and the Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violations of the above statutes.

## THIRD CLAIM FOR RELIEF
### Conspiracy to Monopolize Under State Law
### (Asserted Against All Defendants and Unnamed (as defendants) Generic Competitors/Co-Conspirators)

267.    Plaintiff incorporates by reference the preceding allegations.

268.    This claim is pled against all Defendants as well as each of the unnamed (as defendants) Generic Competitors/Co-Conspirators.

269.    Defendants and each of the Generic Competitors committed at least one overt act in furtherance of the conspiracy.

270.    As described above, Defendants have possessed monopoly power nationwide and in each of the United States in the market for nebivolol HCl. No other manufacturer has sold a competing generic version of Bystolic.

271.    Defendants willfully and unlawfully engaged in a continuing illegal conspiracy to monopolize the nebivolol HCl market by engaging in an anticompetitive scheme to keep generic equivalents from the market—not as a result of providing a superior product, business acumen, or historical accident.

272.    Defendants knowingly and intentionally conspired to monopolize the nebivolol HCl products (i.e., Bystolic in all forms and dosage strengths) and AB-rated bioequivalent nebivolol HCl products market as described above. Defendants accomplished this scheme by,

*inter alia*, (1) entering into illegal agreements with each of the Generic Competitors, which delayed the entry of generic Bystolic in order to lengthen the period in which Defendants' branded Bystolic could monopolize the market and generate supra-competitive profits; (2) fixing, raising, and maintaining the prices of Bystolic so that Plaintiff and Class members would pay for Bystolic at supra-competitive prices; (3) unlawfully agreeing to divide a market and delay price reductions and generic competition for Bystolic; (4) allocating to Defendants 100% of the U.S. sales of nebivolol HCl until September 17, 2021; and (5) otherwise conspiring to unlawfully monopolize and conspire to monopolize the market for nebivolol HCl.

273.    Each of the reverse-payment agreements between Defendants and the Generic Defendants were unlawful and were large and unjustified. Each agreement between Defendants and the Generic Competitors harmed the proposed Class as set forth above.

274.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse-payment agreements between Defendants and each of the Generic Competitors that outweighs their harmful effects. Even if there were some conceivable justification, the payments were not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

275.    The goal, purpose, and direct and foreseeable effect of Defendants' scheme was to prevent and delay the sale of nebivolol HCl products in the United States and its territories at prices significantly below Defendants' prices for Bystolic, thereby effectively preventing the price of nebivolol HCl products from declining dramatically.

276.    The goal, purpose, and direct and foreseeable effect of Defendants' scheme was also to maintain and extend its monopoly power with respect to nebivolol HCl products. Defendants' illegal scheme allowed Defendants to continue charging supra-competitive prices

for nebivolol HCl products, without a substantial loss of sales, reaping substantial unlawful monopoly profits.

277.    Plaintiff and members of the Class purchased substantial amounts of Bystolic indirectly from Defendants.

278.    As a result of Defendants' illegal conduct, Plaintiff and members of the Class were compelled to pay, and did pay, more than they would have paid for their nebivolol HCl requirements absent Defendants' illegal conduct. But for Defendants' illegal conduct, competitors would have begun selling generic Bystolic sooner, and prices for nebivolol HCl products would have been lower, sooner.

279.    Had manufacturers of generic nebivolol HCl entered the market and lawfully competed with Defendants, Plaintiff and other members of the Class would have substituted lower-priced generic nebivolol HCl products for the higher-priced brand-name Bystolic for some or all of their nebivolol HCl products requirements, and/or would have paid lower prices on their remaining Bystolic and/or AB-rated bioequivalent purchases.

280.    But for Defendants' illegal conduct, competitors would have begun marketing generic versions of Bystolic well before September 17, 2021, and they would have been able to market such versions more successfully.

281.    By engaging in the foregoing conduct, Defendants violated the following state antitrust laws:

　　　　　　a)    Ariz. Rev. Stat. Ann. §§ 44-1403, *et seq.*, with respect to purchases of Bystolic in Arizona by Class members and/or purchases of Bystolic by Class members residing in Arizona.

b)      Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases of Bystolic in California by Class members and/or purchases of Bystolic by Class members residing in California.

c)      C.G.S.A. §§ 35-27, *et seq.*, with respect to purchases of Bystolic in Connecticut by Class members and/or purchases of Bystolic by Class members residing in Connecticut.

d)      D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of Bystolic in the District of Columbia by Class members and/or purchases of Bystolic by Class members residing in the District of Columbia.

e)      Haw. Rev. Stat. §§ 480-2, 480-9, *et seq.*, with respect to purchases of Bystolic in Hawaii by Class members and/or purchases of Bystolic by Class members residing in Hawaii.

f)      740 Ill. Comp. Stat. §§ 10/3, *et seq.*, with respect to purchases of Bystolic in Illinois by Class members and/or purchases of Bystolic by Class members residing in Illinois.

g)      Iowa Code §§ 553.5, *et seq.*, with respect to purchases of Bystolic in Iowa by Class members and/or purchases of Bystolic by Class members residing in Iowa.

h)      Kan. Stat. Ann. §§ 50-112, 50-161(b), *et seq.*, with respect to purchases of Bystolic in Kansas by Class members and/or purchases of Bystolic by Class members residing in Kansas.

i)      Me. Rev. Stat. Ann. 10 §§ 1102, *et seq.*, with respect to purchases of
        Bystolic in Maine by Class members and/or purchases of Bystolic by
        Class members residing in Maine.

j)      MD Code Ann., Com. Law, §§ 11-204, *et seq.*, with respect to purchases
        of Bystolic in Maryland by Class members and/or purchases of Bystolic
        by Class members residing in Maryland.

k)      Mich. Comp. Laws Ann. §§ 445.773, *et seq.*, with respect to purchases of
        Bystolic in Michigan by Class members and/or purchases of Bystolic by
        Class members residing in Michigan.

l)      Minn. Stat. §§ 325D.52, *et seq.*, and Minn. Stat. §§ 8.31, *et seq.*, with
        respect to purchases of Bystolic in Minnesota by Class members and/or
        purchases of Bystolic by Class members residing in Minnesota.

m)      Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Bystolic
        in Mississippi by Class members and/or purchases of Bystolic by Class
        members residing in Mississippi.

n)      Neb. Rev. Stat. §§ 59-802, *et seq.*, with respect to purchases of Bystolic in
        Nebraska by Class members and/or purchases of Bystolic by Class
        members residing in Nebraska.

o)      Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of
        Bystolic in Nevada by Class members and/or purchases of Bystolic by
        Class members residing in Nevada.

p)    N.H. Rev. Stat. Ann. §§ 356:3, *et seq.*, with respect to purchases of
Bystolic in New Hampshire by Class members and/or purchases of
Bystolic by Class members residing in New Hampshire.

q)    N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases of Bystolic in
New Mexico by Class members and/or purchases of Bystolic by Class
members residing in New Mexico.

r)    N.Y. Gen. Bus. Law § 340 with respect to purchases of Bystolic in New
York by Class members and/or purchases of Bystolic by Class members
residing in New York.

s)    N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases of Bystolic in
North Carolina by Class members and/or purchases of Bystolic by Class
members residing in North Carolina.

t)    N.D. Cent. Code Ann. §§ 51-08.1-03, *et seq.*, with respect to purchases of
Bystolic in North Dakota by Class members and/or purchases of Bystolic
by Class members residing in North Dakota.

u)    Ohio Rev. Code Ann. § 1331.01, *et. seq.*, with respect to purchases of
Bystolic in Ohio by Class members and/or purchases of Bystolic by Class
members residing in Ohio.

v)    Or. Rev. Stat. §§ 646.730, *et seq.*, with respect to purchases of Bystolic in
Oregon by Class members and/or purchases of Bystolic by Class members
residing in Oregon.

w)    R.I. Gen. Laws §§ 6-36-5, *et seq.*, with respect to purchases of Bystolic in

Rhode Island by Class members and/or purchases of Bystolic by Class

members residing in Rhode Island.

x)    S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases of

Bystolic in South Dakota by Class members and/or purchases of Bystolic

by Class members residing in South Dakota.

y)    Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of

Bystolic in Tennessee by Class members and/or purchases of Bystolic by

Class members residing in Tennessee.

z)    Utah Code Ann. §§ 76-10-3104, *et seq.*, with respect to purchases of

Bystolic in Utah by Class members and/or purchases of Bystolic by Class

members residing in Utah.

aa)   W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases of Bystolic in

West Virginia by Class members and/or purchases of Bystolic by Class

members residing in West Virginia.

bb)   Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Bystolic in

Wisconsin by Class members and/or purchases of Bystolic by Class

members residing in Wisconsin.

282.    Plaintiff and members of the Class have been injured in their business or property

by reason of Defendants' antitrust violations alleged in this claim. Their injuries consist of:

(1) being denied the opportunity to purchase lower-priced generic nebivolol HCl products,

sooner, and (2) paying higher prices for nebivolol HCl products than they would have paid in the

absence of Defendants' conduct. These injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

283.    Plaintiff and the Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violations of the above statutes.

**FOURTH CLAIM FOR RELIEF**
**State Consumer Protection Violations**
**(Asserted Against All Defendants and Unnamed (as defendants) Generic Competitors/Co-Conspirators)**

284.    Plaintiff incorporates by reference the preceding allegations.

285.    Defendants engaged in unfair competition, and/or unfair, unconscionable, and/or deceptive acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair and/or unconscionable acts or practices, Plaintiff and Class members were deprived of the opportunity to purchase less expensive AB-rated generic bioequivalents of Bystolic and forced to pay higher prices.

a)    Defendants have engaged in unfair competition and/or unfair, unlawful, and/or fraudulent business practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, with respect to purchases of Bystolic in California by Class members and/or purchases of Bystolic by Class members residing in California. In particular, Defendants have engaged in an unlawful business practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by violating Cal. Bus. & Prof. Code § 16700, *et seq.*, and Cal. Health and Safety Code § 134002.

b)    Defendants have engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices

in violation of Fla. Stat. § 501.201, *et seq.*, with respect to purchases of

Bystolic in Florida by Class members and/or purchases of Bystolic by

Class members residing in Florida.

c)      Defendants have engaged in unfair methods of competition and unfair or

deceptive acts or practices in violation of Haw. Rev. Stat. §§ 480, *et seq.*,

with respect to purchases of Bystolic in Hawaii by Class members and/or

purchases of Bystolic by Class members residing in Hawaii.

d)      Defendants have engaged in unfair methods of competition and unfair or

deceptive acts or practices in violation of 815 Ill. Comp. Stat.

Ann.§§ 505/1, *et seq.*, with respect to purchases of Bystolic in Illinois by

Class members and/or purchases of Bystolic by Class members residing

in Illinois.

e)      Defendants have engaged in unfair methods of competition and unfair or

deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*,

with respect to purchases of Bystolic in Maine by Class members and/or

purchases of Bystolic by Class members residing in Maine.

f)      Defendants have engaged in unfair methods of competition and unfair or

deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*,

with respect to purchases of Bystolic in Massachusetts by Class members

and/or purchases of Bystolic by Class members residing in

Massachusetts, in that the actions and transactions alleged herein

occurred primarily and/or substantially within Massachusetts, with

thousands of Class members paying substantially higher prices for Bystolic.

g)    Defendants have engaged in unfair methods of competition and unfair or deceptive acts or practices in violation of Mont. Code Ann. §§ 30-14-101, *et seq.*, with respect to purchases of Bystolic in Montana by Class members and/or purchases of Bystolic by Class members residing in Montana.

h)    Defendants have engaged in unfair methods of competition and unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601, *et seq.*, with respect to purchases of Bystolic in Nebraska by Class members and/or purchases of Bystolic by Class members residing in Nebraska.

i)    Defendants have engaged in unfair competition, and/or unfair/unconscionable, and/or deceptive acts or practices in violation of Nev. Rev. Stat. §§ 598.0903, *et seq.*, with respect to purchases of Bystolic in Nevada by Class members and/or purchases of Bystolic by Class members residing in Nevada.

j)    Defendants have engaged in unfair methods of competition and/or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, with respect to purchases of Bystolic in New Hampshire by Class members and/or purchases of Bystolic by Class members residing in New Hampshire.

k)    Defendants have engaged in unfair and/or deceptive trade practices and/or unconscionable trade practices in violation of N.M. Stat. § 57-12-

1, *et seq*., with respect to purchases of Bystolic in New Mexico by Class members and/or purchases of Bystolic by Class members residing in New Mexico.

l)    Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*., with respect to purchases of Bystolic in New York by Class members and/or purchases of Bystolic by Class members residing in New York.  To the extent New York law so requires, Plaintiff hereby forgoes any minimum or punitive damages in order to preserve the right of New York Class members to recover actual damages by way of a class action.

m)    Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*., with respect to purchases of Bystolic in North Carolina by Class members and/or purchases of Bystolic by Class members residing in North Carolina.

n)    Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of R.I. Gen. Law § 6-13.1-1, *et seq*., with respect to purchases of Bystolic in Rhode Island by Class members and/or purchases of Bystolic by Class members residing in Rhode Island.

o)    Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of

Tenn. Code Ann. 47-18-104, *et seq.*, with respect to purchases of Bystolic in Tennessee by Class members and/or purchases of Bystolic by Class members residing in Tennessee.

p)     Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of Utah Code Ann. §§ 13-11-1, *et seq.*, with respect to purchases of Bystolic in Utah by Class members and/or purchases of Bystolic by Class members residing in Utah.

q)     Defendants have engaged in unfair competition, and/or unfair/unconscionable and/or deceptive acts or practices in violation of Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases of Bystolic in Vermont by Class members and/or purchases of Bystolic by Class members residing in Vermont.

r)     Defendants have engaged in unfair methods of competition and unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*, with respect to purchases of Bystolic in West Virginia by Class members and/or purchases of Bystolic by Class members residing in West Virginia.

286.    Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair, unconscionable, and/or deceptive acts or practices alleged in this Count. Their injury consists of paying higher prices for Bystolic than they would have paid in the absence of these violations.  This injury is of the type the state

consumer protection statutes were designed to prevent and directly results from Defendants'
unlawful conduct.

## FIFTH CLAIM FOR RELIEF
### Unjust Enrichment Under State Law
### (Against All Defendant)

287.    Plaintiff incorporates by reference the preceding allegations.

288.    To the extent required, this claim is pleaded in the alternative to the other claims
in this Complaint.

289.    This claim is pled by Plaintiff and the Class against all Defendants.

290.    Defendants have financially benefited from overcharges on sales of branded
Bystolic, which resulted from the unlawful and inequitable acts alleged in this Complaint. These
overcharges were borne by Plaintiff and members of the Class who purchased and/or reimbursed
all or part of the purchase price of branded Bystolic. The benefits conferred upon Defendants are
substantial and measurable, in that the revenues Defendants have earned due to unlawful
overcharges are ascertainable by review of both sales records and the unlawful agreements
themselves.

291.    There is gross disparity between the price that Plaintiff and members of the Class
paid for Bystolic compared to what they would have paid for less expensive generic versions of
Bystolic, which should and would have been available but for Defendants' unlawful and
inequitable conduct.

292.    Defendants repeatedly and continuously received financial benefits at the expense
of Plaintiff and members of the Class through each sale of branded Bystolic at an inflated price.

293.    It would be futile for Plaintiff and members of the Class to seek a remedy from
any party with whom they had or have privity of contract. Defendants have paid no consideration

to any other person for any of the benefits they received indirectly from Plaintiff and members of the Class.

294.    It would be futile for Plaintiff and the members of the Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Bystolic, as those intermediaries cannot reasonably be expected to compensate Plaintiff and members of the Class for Defendants' unlawful conduct.

295.    The financial benefits that Defendants derived rightfully belong to Plaintiff and members of the Class, who paid anticompetitive prices that inured to Defendants' benefit.

296.    It would be inequitable under the unjust enrichment principles of the states listed below for Defendants to retain any of the overcharges that Plaintiff and members of the Class paid for branded Bystolic, which were derived from Defendants' anticompetitive, unfair, unconscionable, and/or deceptive methods, acts, or trade practices.

297.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds received by them into a common fund for the benefit of Plaintiff and members of the Class.

298.    A constructive trust should be imposed upon all unlawful or inequitable sums Defendants received, which arise from overpayments for branded Bystolic by Plaintiff and members of the Class.

299.    Plaintiff and members of the Class have no adequate remedy at law.

300.    By engaging in the foregoing unlawful or inequitable conduct, which deprived Plaintiff and members of the Class of the opportunity to purchase lower-priced generic versions Bystolic and forced them to pay higher prices for branded Bystolic, Defendants have been unjustly enriched in violation of the common law of various states and commonwealths, as outlined below:

**Alabama**

301.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Alabama at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Class as a direct result of the unlawful overcharges and have retained this money. Defendants have benefitted at the expense of the Class from revenue resulting from unlawful overcharges for branded Bystolic. It is inequitable for Defendants to accept and retain the benefits received without compensating the Class.

**Alaska**

302.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Alaska at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefits bestowed upon them by the Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Arizona**

303.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded Bystolic. The Class has been impoverished by the overcharges for branded Bystolic resulting from Defendants' unlawful conduct. Defendants' enrichment and

the Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment and the Class's impoverishment, because the Class paid supra-competitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Class has no remedy at law.

**Arkansas**

304.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Arkansas at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**California**

305.    A claim for unjust enrichment in California is also referred to as a claim for restitution, and Plaintiff asserts, in the alternative, both a claim for unjust enrichment and a claim for restitution. Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in California at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class as a direct result of the unlawful overcharges. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of the Class.

**Colorado**

306.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Colorado at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the

nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants have benefitted at the expense of the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Connecticut**

307.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Connecticut at prices that were more than they would have been but for Defendants' actions. Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of the Class.

**Delaware**

308.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Delaware at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded Bystolic. The Class has been impoverished by the overcharges for branded Bystolic resulting from Defendants' unlawful conduct. Defendants' enrichment and the Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Class paid supra-competitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Class has no remedy at law.

**District of Columbia**

309.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in the District of Columbia at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to the Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

310.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Florida at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefits bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Georgia**

311.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Georgia at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Hawaii**

312.     Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Hawaii at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Idaho**

313.     Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Idaho at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit conferred upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Illinois**

314.     Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Illinois at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Class. It is against equity, justice, and

good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

315.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Iowa at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded Bystolic, which revenue resulted from anticompetitive prices paid by the Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of the Class. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Class.

**Kansas**

316.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Kansas at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Kentucky**

317.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Kentucky at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic

detriment of the Class. Defendants appreciated the benefit conferred upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Louisiana**

318.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Louisiana at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded Bystolic. The Class has been impoverished by the overcharges for branded Bystolic resulting from Defendants' unlawful conduct. Defendants' enrichment and the Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Class paid supra-competitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Class has no other remedy at law.

**Maine**

319.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Maine at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Maryland**

320.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Maryland at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Massachusetts**

321.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Massachusetts at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit conferred upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Michigan**

322.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Michigan at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to the Class.

Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Minnesota**

323.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Minnesota at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated and knowingly accepted the benefits bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Mississippi**

324.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Mississippi at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Class as a direct result of the unlawful overcharges. Defendants retain the benefit of overcharges received on the sales of branded Bystolic, which in equity and good conscience belong to the Class on account of Defendants' anticompetitive conduct. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Missouri**

325.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Missouri at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic

detriment of the Class. Defendants appreciated the benefit bestowed upon them by the Class.
Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust
circumstances arising from unlawful overcharges to the Class.

### Montana

326.    Defendants unlawfully overcharged members of the Class, who made purchases
of or reimbursements for branded Bystolic in Montana at prices that were more than they would
have been but for Defendants' actions. The Class has conferred an economic benefit upon
Defendants, in the nature of revenue resulting from unlawful overcharges to the economic
detriment of the Class. Under the circumstances, it would be inequitable for Defendants to retain
such benefits without compensating the Class.

### Nebraska

327.    Defendants unlawfully overcharged members of the Class, who made purchases
of or reimbursements for branded Bystolic in Nebraska at prices that were more than they would
have been but for Defendants' actions. Defendants received money from the Class as a direct
result of the unlawful overcharges and have retained this money. Defendants have paid no
consideration to any other person in exchange for this money. In justice and fairness, Defendants
should disgorge such money and remit the overcharged payments back to the Class.

### Nevada

328.    Defendants unlawfully overcharged members of the Class, who made purchases
of or reimbursements for branded Bystolic in Nevada at prices that were more than they would
have been but for Defendants' actions. The Class has conferred an economic benefit upon
Defendants in the nature of revenue resulting from unlawful overcharges for branded Bystolic.
Defendants appreciated the benefits bestowed upon them by the Class, for which they have paid

no consideration to any other person. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**New Hampshire**

329.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in New Hampshire at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

330.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in New Jersey at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the Class. Defendants have paid no consideration to any other person for any of the unlawful benefits they received from the Class with respect to Defendants' sales of branded Bystolic. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Class.

**New Mexico**

331.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in New Mexico at prices that were more than they

would have been but for Defendants' actions. Defendants have knowingly benefitted at the expense of the Class from revenue resulting from unlawful overcharges for branded Bystolic. To allow Defendants to retain the benefits would be unjust because the benefits resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

332.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in New York at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded Bystolic, which revenue resulted from anticompetitive prices paid by the Class, which inured to Defendants' benefit. Defendants' enrichment has occurred at the expense of the Class. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

333.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in North Carolina at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. The Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from unlawful overcharges to the Class. The benefits conferred upon Defendants are measurable, in

that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records. Defendants consciously accepted the benefits conferred upon them.

**North Dakota**

334.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded Bystolic. The Class has been impoverished by the overcharges for branded Bystolic resulting from Defendants' unlawful conduct. Defendants' enrichment and the Class's impoverishment are connected. There is no justification for Defendants' receipt of the benefits causing their enrichment, because the Class paid supra-competitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Class has no remedy at law. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Class.

**Oklahoma**

335.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Oklahoma at prices that were more than they would have been but for Defendants' actions. Defendants received money from the Class as a direct result of the unlawful overcharges and have retained this money. Defendants have paid no consideration to any other person in exchange for this money. The Class has no remedy at law. It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Oregon**

336.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Oregon at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of the benefit bestowed upon them by the Class. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating the Class.

**Pennsylvania**

337.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Pennsylvania at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Puerto Rico**

338.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Puerto Rico at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for branded Bystolic. The Class has been impoverished by the overcharges for branded Bystolic resulting from Defendants' unlawful conduct. Defendants' enrichment and the Class's impoverishment are connected. There is no justification for

Defendants' receipt of the benefits causing their enrichment and the Class's impoverishment, because the Class paid supra-competitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. The Class has no remedy at law.

**Rhode Island**

339.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Rhode Island at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**South Carolina**

340.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in South Carolina at prices that were more than they would have been but for Defendants' actions. The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to the Class. Defendants realized value from the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**South Dakota**

341.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in South Dakota at prices that were more than they

would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing the Class.

**Tennessee**

342.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Tennessee at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class. It would be futile for the Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from the Class with respect to Defendants' sales of branded Bystolic. It would be futile for the Class to exhaust all remedies against the entities with which the Class has privity of contract because the Class did not purchase branded Bystolic directly from any Defendant.

**Texas**

343.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Texas at prices that were more than they would have been but for Defendants' actions. Defendants have received a benefit from the Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from

anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of or appreciated the benefit bestowed upon them by the Class. The circumstances under which Defendants have retained the benefits bestowed upon them by the Class are inequitable in that they result from Defendants' unlawful overcharges for branded Bystolic. The Class has no remedy at law.

**Utah**

344.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Utah at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Vermont**

345.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Vermont at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants accepted the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**Virginia**

346.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Virginia at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of the benefit bestowed upon them. Defendants should reasonably have expected to repay the Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of branded Bystolic. Defendants have paid no consideration to any other person for any of the benefits they have received from the Class.

**Washington**

347.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Washington at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit conferred upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

**West Virginia**

348.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in West Virginia at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon

Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants were aware of or appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

### Wisconsin

349.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Wisconsin at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants appreciated the benefit bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

### Wyoming

350.    Defendants unlawfully overcharged members of the Class, who made purchases of or reimbursements for branded Bystolic in Wyoming at prices that were more than they would have been but for Defendants' actions. The Class has conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of the Class. Defendants accepted, used and enjoyed the benefits bestowed upon them by the Class. Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating the Class.

### SIXTH CLAIM FOR RELIEF
**Injunctive Relief Under Sherman Act Sections 1 and 2**
**(Against All Defendants and Unnamed (as defendants) Generic Competitors/Co-Conspirators)**

351.    Plaintiff incorporates by reference the preceding allegations.

352.    Based on the conduct alleged in this Complaint, and in particular those allegations set forth in the First, Second, Third, Fourth, and Fifth Claims for Relief, Defendants have also violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

353.    Plaintiff requests that the Court grant injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, as may be necessary and appropriate to restore competition in the market for nebivolol HCl.

## XVI.  DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on its own behalf and on behalf of the proposed Class, prays for judgment against all Defendants, jointly and severally, and that this Court:

1.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the proposed Class, and appoint Plaintiff as the named representative of the class;

2.    Enter joint and several judgment against each of the Defendants on all Claims (First through Sixth) above and in favor of Plaintiff and the proposed Class;

3.    Grant permanent injunctive relief:

    a.   enjoining Defendants from continuing their illegal conduct;

    b.   enjoining Defendants from engaging in future anticompetitive conduct with the purpose or effect of delaying the entry of generic nebivolol HCl or other generic drugs; and

    c.   requiring Defendants to take affirmative steps to dissipate the continuing effects of their prior unlawful conduct;

4.      Award Plaintiff and the proposed Class damages (*i.e.,* three times overcharges) in an amount to be determined at trial, plus interest, in accordance with law;

5.      Grant Plaintiff and the proposed Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

6.      Award Plaintiff and the proposed Class their costs of suit, including reasonable attorneys' fees, as provided by law; and

7.      Award such other and further relief as the Court deems just and proper.

## XVII.  JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury of all claims and issues so triable.

**Dated:** August 19, 2020

**BERMAN TABACCO**

By: */s/ Patrick T. Egan*
        Patrick T. Egan (PE-6812)

One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email: pegan@bermantabacco.com

-and-

Todd A. Seaver (*pro hac vice* to be filed)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: tseaver@bermantabacco.com

*Counsel for Plaintiff Teamsters Western Region &*
*Local 177 Health Care Plan*